Khadija **LONDON** & Alikalie M. **Sillah** and Christina **Walls,** Ann **Torregrussa,** Harold **Wilkinson,** Rev. Walter **Golden,** Golden Gate Baptist Church and Kenneth & Julia **Davenport,** in the Superior Court of Pennsylvania, **Appellees,**

v.

**INSURANCE PLACEMENT FACILITY OF PENNSYLVANIA, Appellant (at 1285).**

Khadija **LONDON** & Alikalie M. **Sillah** and Christina **Walls** and Rev. Walter **Golden,** Golden Gate Baptist Church and Kenneth & Julia **Davenport,** in the Superior Court of Pennsylvania, **Appellants (at 1495),**

v.

**INSURANCE PLACEMENT FACILITY, Appellee.**

Superior Court of Pennsylvania.

Argued Nov. 26, 1996.

Filed Nov. 10, 1997.

---

Samuel P. Gerace, Pittsburgh, for Insurance Placement Facility of Pennsylvania.

Arthur S. Alexion, Philadelphia, for London, Sillah, Walls, Torregrussa, Wilkinson, Golden Gate Baptist Church and Davenport.

Before CAVANAUGH, J., CIRILLO, President Judge Emeritus, and POPOVICH, JOHNSON, HUDOCK, FORD ELLIOTT, SAYLOR, EAKIN and SCHILLER, JJ.

HUDOCK, Judge:

In this appeal, we are asked to decide whether the Insurance Placement Facility (Facility) should be permitted to depreciate the cost of repairs to a building when a policyholder under the Pennsylvania Fair Plan Act (Fair Plan) [1] sustains a loss by fire. Under the specific terms of these Fair Plan policies, we hold that the Facility may depreciate the cost of repairs. Therefore, we affirm in part, reverse in part and remand with instructions.

The pertinent facts and procedural history of this case can be summarized as follows: The Facility provided basic property insurance to each of the policyholders pursuant to the terms of the Fair Plan, which requires the Facility to provide such insurance against "loss to real or tangible personal property at a fixed location caused by perils defined and

1. 40 P.S. §§ 1600.101–1600.502.

limited in the standard fire policy prescribed" in 40 P.S. section 636.[2] 40 P.S. § 1600.103(2). Specifically, the policies provided that:

> IN CONSIDERATION OF THE PROVISIONS AND STIPULATIONS HEREIN OR ADDED HERETO, AND OF THE PREMIUM SPECIFIED in the Declarations or in endorsements made a part hereof, this Company, for the term of years specified in the Declarations ... at a location of property involved, to an amount not exceeding the limit of liability specified in the Declarations, does insure the Insured named in the Declarations and legal representatives, *to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality* within a reasonable time after such loss....

*See, e.g.*, Standard Dwelling Property Ins. Policy of Christina Walls, 04/07/93, at SFP–1 (emphasis added). Endorsements to the policies go on to define the term "actual cash value" in language identical or similar to the following:

> In this policy ... "Actual Cash Value" means the cost to repair or replace the damaged property *less deductions for physical deterioration (depreciation)* and obsolescence.

*See, e.g., Id.* at DP–301 FP (emphasis added).

Each of the policyholders sustained a partial loss by fire to property covered by their respective policies with the Facility. While the parties agreed on the cost to repair the partially damaged properties, they disagreed as to whether the Facility should deduct depreciation from those costs. When the Facility deducted depreciation from the policyholders' repair costs, the policyholders brought suit to recover the sums deducted.

Additionally, they claimed that the Facility acted in bad faith. The Facility then filed a motion for summary judgment to which the policyholders filed a cross-motion for summary judgment.

The trial court granted summary judgment in favor of the policyholders on the depreciation issue and in favor of the Facility on the bad faith issue. The Facility then filed an appeal to this Court on the depreciation issue, and the policyholders cross-appealed on the bad faith issue. A three-member panel of this Court affirmed the trial court. We then granted reargument to review these issues.[3]

We first note our scope and standard of review. As this Court has noted:

> When we review the grant of a motion for summary judgment made under Pa. R.C.P. 1035, the appellate court's scope of review is well-settled: summary judgment is properly granted where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Pa. R.C.P. 1035(b)[4] Summary judgment may be granted only where the right is clear and free from doubt. The moving party has the burden of proving that there is no genuine issue of material fact. The record and any inferences therefrom must be viewed in the light most favorable to the nonmoving party, and any doubt must be resolved against the moving party. The trial court will be overturned on the entry of summary judgment only if there has been an error of law or a clear abuse of discretion.

*First Wis. Trust Co. v. Strausser,* 439 Pa.Super. 192, 198, 653 A.2d 688, 691 (1995) (footnote added) (citations omitted).

Policyholders in the instant appeal urge upon us the argument that existing precedent disallows a deduction for depreciation in a partial loss situation where coverage is

---

2. *Hereinafter,* 40 P.S. section 636 will be referred to as the "standard fire insurance policy."

3. The Facility claims the insureds did not preserve the bad faith issue for review on reargument. (Supplemental Brief for Appellant on the Cross-appeal of Appellees on Reargument at 4.) Because a grant of reargument entitles the parties to *en banc de novo* review of the issues raised on appeal, however, we disagree.

4. Since the order from which the parties appeal was docketed March 20, 1995, old rule 1035(b) applied.

provided under a Standard Fire Policy (thereby placing Pennsylvania in a minority position among the states). They may be correct. *See, e.g.,* Wendy Evans Lehmann, J.D., Annot., *Depreciation as Factor in Determining Actual Cash Value for Partial Loss under Insurance Policy,* 8 A.L.R.4th 534, 551–52. However, the narrow issue before us does not involve a Standard Fire Policy, but rather one issued under the Fair Plan, and that distinction is critical.

The rules of statutory interpretation in our Commonwealth require us to ascertain and effectuate the legislative intent underlying the enactment of a particular statute. 1 Pa.C.S.A. § 1921(a). Where the words of a statute are clear and free from ambiguity, the legislative intent is to be gleaned from those very words. Where, however, the statute is unclear or susceptible of differing interpretations, the courts must look to the necessity of the act, the object to be attained, the circumstances under which it was enacted and any legislative or administrative interpretations thereof. *Pennsylvania Fin. Resp. Assigned Claims Plan v. English,* 541 Pa. 424, 429, 664 A.2d 84, 87 (1995).

As stated by our legislature, one of the purposes of the Fair Plan is "[t]o encourage maximum use, in obtaining ***basic property insurance, as defined in this act,*** of the normal insurance market provided by the private property insurance industry." 40 P.S. § 1600.102(2) (emphasis added). "Basic property insurance" is further defined as "insurance against direct loss to real or personal property ... caused ***by perils defined and limited in the standard fire policy....***" 40 P.S. § 1600.103(2) (emphasis added).

The Fair Plan was enacted in 1968. It was written at the invitation of the federal government[5] and designed as a response to the urban riots and social upheaval during the 1960s. The Plan requires each insurer that writes property insurance in this Commonwealth to participate in providing insurance for high-risk property for which insurance is not normally available. 40 P.S. § 1600.201(a).

This Court previously has had the opportunity to review the purposes of this legislation. At that time, we stated:

> The Pennsylvania Fair Plan Act ... was enacted to make insurance coverage available to protect property for which basic property insurance was not available through the normal insurance market. It was also intended to create a reinsurance arrangement whereby the responsibility for insuring such properties would be shared by all insurance companies doing business in the Commonwealth.

*Stallo v. Ins. Placement Facility of Pa.,* 359 Pa.Super. 157, 518 A.2d 827, 829 (1986), *alloc. den.,* 515 Pa. 609, 529 A.2d 1082 (1987).

Considering the plain language of the statute, its purposes as enunciated by our legislature and the societal pressures that gave rise to its enactment and prior precedent, we cannot reach the conclusion that "basic property insurance" as used in the Fair Plan is the equivalent of a standard fire insurance (section 636) policy. Our legislature knew of section 636 and its interpretation when it wrote and enacted the Fair Plan. It could have chosen to define basic fire insurance as the section 636 policy. It did not. Instead, the legislature carefully defined the term as insurance against "perils defined and limited in the standard fire policy." 40 P.S. § 1600.103(2). This definition references only a small portion of section 636, that which deals with defining and limiting perils. The limited reference to the standard fire policy should be given effect. The statute does not require more.

Ultimately, nothing in the language, purposes or history of the Act suggests that our legislature meant to require Fair Plan insurers to provide anything other than no-frills insurance for the benefit of those who could not otherwise obtain coverage.[6] Analogizing to the ambit of automobile insurance, we

---

5. *See,* Urban Property Protection and Reinsurance Act of 1968, Pub.L. No. 90–448, sec. 1103, § 1211(a), 82 Stat. 476 (codified at 12 U.S.C. § 1749bbb–3 (1997)).

6. *Accord, Wells v. Missouri Fair Plan,* 653 S.W.2d 207, 212 (1983).

would compare Fair Plan policies with Assigned Risk Plan[7] policies. Both programs are designed to provide insurance to those persons who could not otherwise obtain it, due to the high-risk they represent. All insurers who write policies in the Commonwealth for auto or property are required by statute to participate in the Assigned Risk or Fair Plans, respectively. Finally, the risk of loss from these policies is then shared by all the insurers in the pool.

Similarly to the policyholders in the instant appeal, Assigned Risk Plan policyholders do not obtain "normal" auto insurance under the plan. They receive only very basic auto insurance. With the Assigned Risk Plan, the legislature intended to promote the limited public policy goal of all drivers having at least some auto insurance in the event of an unfortunate accident. Likewise, the Fair Plan is designed to provide property owners with some measure of insurance for their buildings. However, there is no evidence that the legislature intended for Assigned Risk or Fair Plan policies to be "standard" auto or "standard" property insurance policies. They provide basic, no-frills protection and nothing more.

Moreover, if the analysis urged by the policyholders were to be accepted, it would essentially provide Fair Plan policyholders with replacement cost coverage. This type of policy is considered to be nearly the best type of coverage because "[it] allows recovery for the actual value of property at the time of loss, *without deduction for deterioration, obsolescence, and similar depreciation* of the property's value." *Gilderman v. State Farm Ins. Co.*, 437 Pa.Super. 217, 220, 649 A.2d 941, 943 (1994), quoting, Randy R. Koenders, J.D., Annot., *Construction and Effect of Property Insurance Provision Permitting Recovery of Replacement Cost of Property*, 1 A.L.R. 5th 817, 827–28 (1992) (emphasis added). Clearly, the benefits of a replacement cost coverage policy are greater, and thus cost more than those contemplated by a basic, no-frills Fair Plan policy. Since the result proposed by the policyholders

would provide replacement cost protection to those who bought only basic coverage, it fails to comport with intrinsic ideas of fairness as well.

Given our determination that Fair Plan policies are not standard fire insurance policies under section 636, we apply the policies at issue in this appeal as written. In interpreting an insurance contract, we must ascertain the intent of the parties as manifested by the language of the written agreement. When policy provisions are clear and unambiguous, a court must give effect to the language used by the parties in the contract. *Paylor v. Hartford Ins. Co.*, 536 Pa. 583, 585, 640 A.2d 1234, 1235 (1994); *Steinbacher v. Page*, 410 Pa.Super. 586, 587, 600 A.2d 608, 609 (1991). A court may not re-write an insurance contract, or construe clear and unambiguous policy language to mean anything other than what it says. *Guardian Life Ins. Co. of America v. Zerance*, 505 Pa. 345, 352, 479 A.2d 949, 953 (1984); *Jeffrey v. Erie Ins. Exch.*, 423 Pa.Super. 483, 488, 621 A.2d 635, 638 (1993).

All of the Fair Plan policies at issue in this appeal were issued by the Facility. They promised to pay the "actual cash value of the property at the time of loss." In all of the policies, "actual cash value" was further defined:

> Actual Cash Value is the cost to repair or replace the damaged property less deduction for physical deterioration (depreciation) and obsolescence.[8]

The policyholders contend that this language prevents the Facility from deducting depreciation in the event of a partial loss to the property. We disagree.

The policy language at issue could not be any clearer. It plainly states that a deduction for depreciation will be taken *either* when an insured property is replaced *or* when it is repaired. In this context, "repair" can only mean work done to rehabilitate a building which has been damaged, but is not a total loss. Any other construction fails to effect the clear import of the contract terms.

---

7. *75 Pa.C.S.A.* §§ 1741—1747.

8. As already noted, even if this language was not exactly the same in each policy, all policies contained substantially the same language.

Therefore, we conclude that the parties' unambiguous contract allows the Facility to depreciate partial losses. Thus, the trial court erred when it granted the policyholders' motion for summary judgment on the depreciation issue.

■ Additionally, assuming arguendo that the policyholders are correct and the Facility cannot depreciate partial losses under the standard fire insurance policy, the definitional endorsements added to these policies by the Facility must be given effect. As our Supreme Court has stated:

> The [insurance] companies prepare their own policy forms and presumably exclude therefrom anything for which they desire not to assume liability.
>
> \*     \*     \*
>
> [I]f the [companies] wish to bring about a different result under circumstances similar to those present here, they will have to change the terms of their policies in order to achieve that end.

*Farber v. Perkiomen Mut. Ins. Co.*, 370 Pa. 480, 486–88, 88 A.2d 776, 779–80 (1952). The *Farber* decision arguably prevents insurance companies from deducting depreciation in the event of a partial loss that does not exceed the depreciated value of the whole property. If the companies wanted to avoid such a result, the court plainly suggested that they should modify their policies.

As the endorsement defining "actual cash value" demonstrates, the Facility has done exactly what the *Farber* court advised. Presumably dissatisfied with the interpretation

of "actual cash value" by the court, the Facility sought to define the phrase with greater precision.[9] Especially when the high-risk associated with insuring property under the Fair Plan is considered, it is logical that the Facility would choose to protect itself with specific definitions of terms or phrases. Finally, it is an extremely unremarkable choice when one considers that our Supreme Court invited insurance companies to do this in *Farber*.

Having concluded that the Facility is permitted to depreciate partial losses under the terms of the Fair Plan policies before us, we must reject the policyholders' allegation of bad faith. Therefore, we hold that the trial court properly entered summary judgment in favor of the Facility on the policyholders' claim of bad faith. *Accord, Alberici v. Safeguard Mut. Ins. Co.*, 444 Pa.Super. 351, 664 A.2d 110 (1995) (issues were complex and no bad faith shown).

Summary judgment in favor of the Facility on the bad faith claim affirmed. Summary judgment in favor of the policyholders on the depreciation issue reversed. Remanded with instructions to enter summary judgments in favor of the Facility. Jurisdiction relinquished.[10]

FORD ELLIOTT, J., files a Concurring and Dissenting Opinion.

SCHILLER, J., files a Concurring and Dissenting Opinion.

---

9. According to an affidavit submitted by the General Manager of the Facility, and uncontradicted by insureds, the Facility submitted for approval to the Insurance Department of Pennsylvania the endorsement at issue here, pursuant to 40 P.S. section 477b, requiring the Department's approval of all endorsements to fire insurance policies and 40 P.S. section 1600.206 requiring the operation of the Facility at all times be subject to the supervision and regulation of the Insurance Commissioner. The Pennsylvania Insurance Department approved these endorsements, effective July 1, 1992.

10. In her concurring and dissenting opinion, our colleague Judge Ford Elliott suggests that the *Farber* decision invited the insurance companies to lobby the General Assembly for a change in the standard fire insurance policy, and not, as we

suggest, to change the language of their existing policies. The plain language of *Farber* invites the insurance companies to change the terms of their policies if they dislike the result in that case. "[I]f the [companies] wish to bring about a different result ... they will have to change the terms of their policies in order to achieve that end." *Farber*, 88 A.2d at 780.

In his concurring and dissenting opinion, Judge Schiller states that the premium payments of the insureds did not decline as the value of the properties depreciated. Thus, he concludes that the Facility either covered the properties up to the full policy limits in a partial loss situation or collected excess premiums. Our careful review of both the certified record and the parties' briefs discloses no support for this claim.

SCHILLER, Judge, concurring and dissenting:

I agree with the Majority Opinion that the Court of Common Pleas correctly granted summary judgment in favor of the Insurance Placement Facility ("Facility") on the question of bad faith. However, unlike the Majority, I would also affirm the trial court's grant of summary judgment in favor of the landowners on the breach of contract claim.

According to the argument advanced by the Facility, the insurable interest of properties ordinarily decline each year due to "depreciation" and its responsibility to pay for the repair to such properties should also decline. However, the Facility itself does not seem to have treated the insurable interest of these properties as in decline for purpose of charging premiums, because premium payments were not modified downward to reflect the alleged depreciated interest.[1] To my mind, this course of conduct by the Facility indicates either an intention to fully cover the properties up to the policy limits, or the collection of premiums in excess of the coverage it was actually providing: if the latter is true that fact should have been annually communicated to the insureds so that they could have adjusted their coverage. Moreover, given the social policy reasons which led to the enactment of the enabling legislation, I believe that an interpretation which favors the prevention of urban blight should be accorded these insurance contracts.

FORD ELLIOTT, Judge, concurring and dissenting:

I concur in the majority's determination that the trial court properly entered summary judgment in favor of the Facility on the insureds' bad faith claim. I must respectfully dissent, however, from the majority's conclusion that the provisions of Pennsylvania's standard fire insurance policy, 40 P.S. § 636, do not cover Fair Plan insureds because I am convinced beyond peradventure that my colleagues are mistaken.

As the majority correctly notes, the Pennsylvania Fair Plan Act "was enacted to make insurance coverage available to protect property for which basic property insurance was not available through the normal insurance market." *Stallo v. Ins. Placement Facility of Pa.*, 359 Pa.Super. 157, 161, 518 A.2d 827, 829 (1986), *allocatur denied*, 515 Pa. 609, 529 A.2d 1082 (1987). "The Act essentially 'created a bilateral contract between the United States and the private insurance sector' by which insurance carriers could purchase federal riot reinsurance if they would 'develop and participate in urban area insurance pools in a bona fide attempt to solve the deficiencies within the property insurance market.'" *Wells v. Missouri Property Ins. Placement Facility*, 653 S.W.2d 207, 211 (1983) (*en banc*), quoting Jordan, *FAIR Plans—Revisited*, 1970 A.B.A. Sec. Ins., Neg. & Comp. L.Proc. 154, 156. The Pennsylvania Fair Plan Act, like other Fair Plans enacted throughout the United States, thus provides a *quid pro quo* to insurers: the insurers receive reinsurance for losses occasioned by riot or civil disorder in exchange for their participation in the Fair Plan, under which insurable non-riot losses are shared equally among all participants.

Our Legislature took great pains to set out the purposes of the Fair Plan Act:

The purposes of this act are:

(1) To encourage stability in the property insurance market for property located in urban areas of this Commonwealth;

(2) To encourage maximum use, in obtaining basic property insurance, as defined in this act, of the normal insurance market provided by the private property insurance industry;

(3) To encourage the improvement of the condition of properties located in urban areas of this Commonwealth and to further orderly Community development generally;

(4) To provide for the formulation and administration by an Industry Placement Facility of a plan assuring fair access to insurance requirements (Fair Plan) in order that no property shall be denied basic property insurance through the normal insurance market provided

---

**1.** This fact was admitted by counsel for the Facility during oral argument to this Court.

by the private property insurance industry except after a physical inspection of such property and a fair evaluation of its individual underwriting characteristics;

(5) To publicize the purposes and procedures of the Fair Plan to the end that no one may fail to seek its assistance through ignorance thereof;

(6) To provide for the formulation and administration by the Industry Placement Facility of a reinsurance arrangement whereby property insurers shall share equitably the responsibility for insuring insurable property for which basic property insurance cannot be obtained through the normal insurance market; . . .

(7) To provide a framework for participation by the Commonwealth in a sharing of insured losses resulting from riots and other civil disorders occurring in this Commonwealth through the formation of a Pennsylvania Civil Disorder Authority, in order that insurance companies doing business within this Commonwealth may qualify for Federal reinsurance of such losses if Federal legislation providing for such reinsurance is enacted.

40 P.S. § 1600.102 **Purposes.**

A careful reading of this entire section reveals the Legislature's intent that the *normal* insurance market be made available to Fair Plan insureds, so that they may improve the condition of property in urban areas in order to encourage community development in those areas. 40 P.S. § 1600.102(2), (3). The goal of the Act is to assure that *"no property shall be denied basic property insurance through the normal insurance market* provided by the private property insurance industry . . ."* subject to certain exceptions not relevant here. 40 P.S. § 1600.102(4) (emphasis added). Pennsylvania property insurers are, therefore, required to "share equitably the responsibility for insuring *insurable* property for which basic property insurance cannot be obtained through the normal insurance market[.]" 40 P.S. § 1600.102(6) (emphasis added). It is thus patently clear that the Legis-

lature intended to make available to urban property owners and others in high-risk areas the same "basic" property insurance available to most of us through the normal insurance market. Nevertheless, despite its focus on statutory construction to determine what type of insurance the Legislature intended insurers to offer under the Fair Plan, the majority emphasizes some portions of the above-quoted section's language at the expense of the whole. *See Wilson v. Central Penn Industries, Inc.,* 306 Pa.Super. 146, 150, 452 A.2d 257 (1982) (in determining legislative intent, sections of a statute must be read together and construed with reference to the entire statute).

The Legislature's intent that Fair Plan insureds have access to the normal insurance market, including § 636 standard fire insurance, is also evident in the following language of § 1600.201, which delineates the purposes of the Insurance Placement Facility ("Facility"):

(1) To formulate and administer . . . a plan assuring fair access to insurance requirements (Fair Plan) *in order that no property in urban areas shall be denied basic property insurance through the normal insurance market provided by the private property insurance industry . . . .*

40 P.S. § 1600.201(b)(1) (emphasis added). I therefore believe that the majority's conclusion runs counter to the Facility's very purpose, as articulated by our Legislature.

As the majority correctly notes, the Legislature defined "basic property insurance" as, *inter alia,* "insurance against direct loss to real or tangible personal property at a fixed location caused by perils defined and limited in the standard fire policy prescribed by" 40 P.S. § 636, the standard fire policy statute. 40 P.S. § 1600.103(2). The majority interprets this section to mean that the Legislature only intended basic insurance to mean standard fire insurance insofar as the "perils insured against" are the same. According to the majority, "nothing in the language, purposes or history of the act suggests that our legislature meant to require Fair Plan insurers to provide anything other than no-frills insurance for the benefit of those who could

not otherwise obtain coverage." (Majority opinion at 48–49.) The majority does not, however, explain the type of protection a policy of "no-frills" fire insurance under the Fair Plan must provide. While I agree wholeheartedly with the majority's conclusion that Fair Plan insurers are only required to provide no-frills insurance, I am also firmly convinced that no-frills insurance and standard fire policy insurance are one and the same. *Accord, Wells v. Missouri Property Ins. Placement Facility, supra* at 212.[1]

The full definition of "basic property insurance" under the Pennsylvania Fair Plan follows:

> insurance against direct loss to real or tangible personal property at a fixed location caused by perils defined and limited in the standard fire policy prescribed [in § 636] and in the extended coverage endorsement approved by the commissioner pursuant to [§ 477b], and such vandalism, malicious mischief, burglary, theft, or such other classes of insurance as may be determined by the Industry Placement Facility with the approval of the commissioner, but shall not include insurance on motor vehicle, farm or such manufacturing risks as may be excluded by the commissioner[.]

40 P.S. § 1600.103(2). Thus, while basic property insurance encompasses more than fire insurance, there is no fire insurance in Pennsylvania more basic than standard fire insurance. The majority's holding today would, however, allow Fair Plan insurers *carte blanche* to create *their own* "no-frills" basic fire insurance policies, in complete contravention of 40 P.S. § 637, **Penalty for issuing other than standard fire policies,** which, as its name implies, provides penalties for "any person, corporation, or insurance company, association or exchange" which issues fire insurance policies contrary to the provisions of § 636. 40 P.S. § 637.

That the Legislature did not intend "basic property insurance" under the Fair Plan Act, within the context of fire insurance, to mean anything other than § 636 standard fire insurance is further borne out by 40 P.S. § 636.1, a 1992 addition to Article V. Fire and Marine Insurance. Section 636.1(a), which obviously is not a part of the Fair Plan Act, provides in pertinent part that "[b]asic property insurance shall be continued" for a specified period after the death of a named insured or until the property is sold. 40 P.S. § 636.1(a). Section 636.1(b) then defines "basic property insurance" identically with the definition found in § 1600.103(2), the Fair Plan definition. It is thus clear that the Legislature uses the term "basic property insurance" to refer to all of those basic types of property insurance existing in the normal insurance market, including standard fire insurance. Thus, the use of the term "basic property insurance" in the Fair Plan Act indicates a legislative intent to make available to Fair Plan insureds the same types of basic property insurance, including standard fire insurance, available in the normal insurance market.

Nevertheless, the majority likens the Fair Plan's basic property insurance provided under the Fair Plan Act to the "very basic auto insurance" available under the Assigned Risk Plan.[2] (Majority opinion at 49.) The majority then opines that Assigned Risk Plan policyholders do not obtain "normal" auto insurance under the Plan. *Id.* The majority's reli-

---

1. I find curious the majority's citation to *Wells* in support of its conclusion. (Majority opinion at 48 n. 6.) In *Wells*, the Missouri supreme court was asked to decide whether Fair Plan insureds who suffered a partial loss by fire were covered by Missouri's *valued* policy statute, a special form of insurance in which the value of the damaged property is predetermined when the policy is issued, so that the insured always recovers the full cost to repair or replace the property, up to the amount for which the policy is written. *Wells v. Missouri Property Ins. Placement Facility, supra* at 209–10. In addition to its valued policy statute, Missouri also had a *standard* fire insur-

ance policy, which provided coverage only " 'to the extent of the actual cash value of the property *at the time of loss.*' " *Id.* at 212 (emphasis in original), *quoting* 4 C.S.R. 190–16.060(1)(A) (1978). The *Wells* court concluded that "the legislature intended the FAIR Plan to impose upon Missouri insurers the burden of insuring high-risk property only to the extent of its actual cash value at the time of the loss[,]" as provided by the standard fire insurance policy. *Wells v. Missouri Property Ins. Placement Facility, supra* at 212–13. I reach the same conclusion.

2. 75 Pa.C.S.A. § 1741–1744.

ance on a comparison with the Assigned Risk Plan is deeply troubling for several reasons.

First, my own review of the Assigned Risk Plan and cases interpreting it belies the majority's assertion that Assigned Risk Plan insureds receive substandard motor vehicle insurance. To the contrary, Assigned Risk Plan insureds, like all insureds, are covered by the provisions of the Motor Vehicle Financial Responsibility Law ("MVFRL"). The Assigned Risk Plan itself provides only that the insurance department, after consulting with insurers, shall adopt a reasonable plan for the equitable apportionment among insurers of applicants for motor vehicle liability insurance who are entitled but unable to obtain insurance through ordinary markets. 75 Pa.C.S.A. § 1741. Nothing in the language of the statute indicates that Assigned Risk Plan insureds will receive anything less than a liability policy consonant with the meaning of "financial responsibility," as defined at 75 Pa.C.S.A. § 1702,[3] although no doubt at a surcharged rate. *See* James R. Ronca et al., Pennsylvania Motor Vehicle Insurance—An Analysis of the Financial Responsibility Law, § 16:5 at 199 (1986) (noting that "In practice, the rates for the Assigned Risk Plan are substantially higher than the premiums in the ordinary insurance market[ ]" for the same or similar coverage). Assigned Risk Plan insureds may also elect the limited or full tort option, and may opt for underinsurance and uninsurance motorist protection, just as insureds in the "normal" market may. *See Salazar v. Allstate Ins. Co.*, 450 Pa.Super. 264, 675 A.2d 1259 (1996), *allocatur granted*, 547 Pa. 3, 688 A.2d 165

(1996).[4] Thus, all drivers, whether covered through the Assigned Risk Plan or through the "normal" insurance market, are entitled, at a minimum, to policies providing "financial responsibility."

Likewise, the Fair Plan Act establishes a procedure whereby an insurer may write a policy of insurance at a surcharged rate—or even deny coverage for basic property insurance—after the property at issue has been inspected by the Inspection Bureau. 40 P.S. § 1600.202. Thus, the *insurer* under the Fair Plan, like the *insurer* under the Assigned Risk Plan, may surcharge the insured for the added risk.

Unlike the *insured* under the Assigned Risk Plan, however, the *insured* under the Fair Plan is the individual for whom the Legislature specifically enacted protective legislation: while the Assigned Risk Plan was enacted to protect innocent motorists who are injured in accidents with high-risk drivers, the Fair Plan was enacted to protect from loss individuals who purchase property in high-risk communities, so that they would be encouraged to purchase and develop such property. The Legislature was *not* trying to encourage high-risk motorists to drive when it enacted the Assigned Risk Plan. Additionally, it defies common sense to believe that the Legislature intended urban dwellers in high-risk areas, for whom it especially enacted protective legislation, to pay *more* money for *less* insurance coverage than is available in the normal insurance market.

Nevertheless, the majority reasons that the Facility was only responding to the invitation of our supreme court in *Farber v. Perkiomen Mutual Ins. Co.*, 370 Pa. 480, 88

---

**3.** "Financial responsibility" is defined as "The ability to respond in damages for liability on account of accidents arising out of the maintenance or use of a motor vehicle in the amount of $15,000 because of injury to one person in any one accident, in the amount of $30,000 because of injury to two or more persons in any one accident and in the amount of $5,000 because of damage to property of others in any one accident...." 75 Pa.C.S.A. § 1702.

**4.** I recognize that the Legislature specifically excluded Assigned Risk Plan insureds from some of the coverage available under the MVFRL through the normal insurance market. *See, e.g.,* 75 Pa.C.S.A. § 1791(6), precluding insurers from

offering, at their option, up to at least $300,000 in a single limit for uninsured underinsured and bodily injury liability coverage; and 75 Pa.C.S.A. § 1792, exempting insurers, *inter alia*, from making available to Assigned Risk Plan insureds higher limits of uninsured, underinsured and bodily injury liability coverages up to at least $100,000 for one person. Nevertheless, a "basic" policy of automobile insurance, namely one which provides the insured with "financial responsibility," is the same for all insureds, Assigned Risk Plan and otherwise. Additionally, the Legislature, in its standard fire policy statute, did *not* specifically exclude Fair Plan insureds from § 636 coverage.

A.2d 776 (1952), when it redefined the term "actual cash value" to mean "the cost to replace *or repair*, with proper deductions for depreciation." (Majority opinion at 49–50.) [5] I find this argument unpersuasive for several reasons. First, standard fire policy insurance has been codified since at least 1921, when deviations from the statutorily mandated provisions were likewise statutorily proscribed. 40 P.S. §§ 636, 637. Our supreme court has thus been defining the *statutory* term "actual cash value" as "the cost to *replace* at the time of the loss" since at least 1930, when it decided *Fedas v. Insurance Company of the State of Pennsylvania*, 300 Pa. 555, 151 A. 285 (1930). As the *Farber* court observed, "The legal meaning of that clause having been determined and established by prior decisions of this court, we cannot now depart therefrom without impairing the obligation of the contracts as written." *Farber v. Perkiomen Mutual Ins. Co.*, *supra* at 486, 88 A.2d at 779. Additionally, the actual "invitation" issued by the *Farber* court provides only that "[a]ny change in the defendants' policies in order to avoid in the future the impact of our prior decisions is for them to ponder. What they presently seek cannot justly be accorded by court decision." *Id.* This "invitation" can easily be read as no more than a suggestion that insurers attempt to convince the General Assembly to either alter the statutorily mandated provisions of § 636, or to re-define the term "actual cash value." Certainly such a reading is far more consonant with the language of § 637 than the reading advanced by the Facility and adopted by the majority.

Because I would find that the Facility was required to conform its basic fire insurance coverage to our supreme court's sixty-seven-year-old definition and interpretation of the term "actual cash value," which has been incorporated into the standard fire policy statute, I would necessarily reach the issue avoided by my colleagues; namely, whether the Insurance Placement Facility should be permitted to depreciate *the cost of repairs* to a building when an insured under the Fair Plan Act sustains a partial loss by fire. To decide that issue, it is necessary to examine

the meaning of "actual cash value" as that term has been defined by our supreme court in *Fedas v. Insurance Company of the State of Pennsylvania, supra,* and its progeny.

*Fedas* has consistently been interpreted as holding that, when determining actual cash value, depreciation should not be deducted from the cost to repair a building partially damaged by fire. *See, e.g.,* Wendy Evans Lehmann, J.D., Annotation, *Depreciation as Factor in Determining Actual Cash Value for Partial Loss under Insurance Policy,* 8 A.L.R.4th 533, 550–51 (1981); Note, *Valuation and Measure of Recovery under Fire Insurance Policies,* 49 Colum. L.Rev. 818, 826 n. 58 (1949). The *Fedas* court was required to pass upon the measure of damages in a policy that provided it would pay:

> 'Actual cash value (ascertained with proper deductions for depreciation) of the property at the time of loss or damage, but not exceeding the amount which it would cost to repair or replace the same with materials of like kind and quality within a reasonable time after such loss or damage.'

*Id.* at 561, 151 A. at 287. The court defined the term "actual cash value" as "what it would cost to replace a building or chattel as of the date of the fire." *Id.* Then, after considerable analysis, the *Fedas* court concluded:

> To sum up, actual cash value means the actual value expressed in terms of money of the thing for the purpose for which it was used,—in other words, the real value to replace. The rule established by our decisions seeks a result which will enable the parties to restore the property to as near the same condition as it was at the time of the fire, or pay for it in cash; that was the loss insured against....

*Id.* at 563–64, 151 A. at 288. *See also Patriotic Order Sons of America Hall Association v. Hartford Fire Insurance Co.*, 305 Pa. 107, 157 A. 259 (1931) (holding that "actual cash value" and "sound value" are synonymous terms); and *Metz v. Travelers Fire Ins. Co.*, 355 Pa. 342, 49 A.2d 711 (1946) (holding that, where it was impossible for the insured to obtain materials of like kind and quality to

---

5. *See* discussion *infra.*

rebuild, he could substantially duplicate his building by using steel columns to support the roof).

In 1952, our supreme court again applied the *Fedas* definition of actual cash value in *Farber v. Perkiomen Mutual Ins. Co., supra.* The *Farber* analysis is of particular interest because the insurers in *Farber* sought to do what the Facility instantly seeks to do. Farber purchased two policies, each of which insured against loss "to the extent of the actual cash value of the property at the time of loss" but not to exceed $5,000. *Id.* at 481, 88 A.2d at 777. When the insured building suffered a partial loss by fire, the parties stipulated to the following figures: cost to reproduce the building new immediately before the fire, $39,435.83; 60% depreciation due to age, giving building an actual cash value of $15,774.34; co-insurance the insured was required to carry under the terms of the policy, $12,619.46 (80% of $15,774.34); cost of new materials and labor to restore the building to its use prior to the fire, $17,225.44; amount of insurance carried by insured, $10,-000.

The insured claimed he was entitled to the full $10,000, because the amount of the loss against which he was insured was $13,650, or 10,000/12,619.46 of $17,225.44. The insurer, on the other hand, argued that the $17,-225.44 should be depreciated by 60%, producing a net loss to the insured of $6,890.18, of which the insured was entitled to recover $5,459.16, or 10,000/12,619.46 of $6,890.18. *Id.* The supreme court framed the issue as "whether the loss as determined by the reproduction cost new of the restoration should be depreciated by the percentage of depreciation applicable to the building as a whole in determining its actual cash value immediately prior to the fire." *Id.* at 483, 88 A.2d at 778. Answering that question in the negative, the *Farber* court opined:

> What the defendant companies insured against was loss to the plaintiff for damage by fire to his building not exceeding the amounts named in the respective policies. Whether the damage was partial or total is immaterial. The pertinent inquiry is,—What is the amount of the insured's loss? As is well known, present-day costs

of labor and materials greatly increase the expense of building—restoration which, necessarily, must be done with the labor and materials currently available. If new conditions make the repair work more costly, the extent of the damage to the insured is automatically the greater by so much. *And, as it is a part of the insurer's undertaking to make the insured whole insofar as possible within the limits of the policy,* the augmented damage due to increased costs of restoration is the liability of the insurer up to the specified amount of the insurance. The underlying principle was clearly recognized and applied in *Pennsylvania Company, etc. v. Philadelphia Contributionship,* 201 Pa. 497, 500, 51 A. 351, 352, 57 L.R.A. 510 [1902].

*Id.* (emphasis added). Thus, applying its prior analyses in *Fedas* and its progeny, the *Farber* court readily concluded Farber was entitled to recover the face amount of the policies, or $10,000, which was still some $7,225.44 less than the cost of reconstruction. *Farber v. Perkiomen Mutual Ins. Co., supra* at 487–88, 88 A.2d at 780.

The insurance companies argued that Farber was receiving a windfall because he would have only been entitled to the $10,000 if the entire building had been destroyed, whereas under the court's analysis, he was receiving $10,000 when only 44% of the building had been destroyed. *Id.* In response, the *Farber* court observed, "But, that disparity cannot operate to diminish what the defendants insured against, namely, to make the plaintiff whole as far as possible for *the cost of restoring the building to its prior use up to the amount of the insurance in the policies.*" *Id.* (emphasis added).

Other jurisdictions have reached the same conclusion. *See, e.g., McIntosh v. Hartford Fire Insurance Co.,* 106 Mont. 434, 78 P.2d 82, 84, 115 A.L.R. 1164, 1166–1169 (1938) (citing *Fedas v. Insurance Company of the State of Pennsylvania, supra,* and remanding to the trial court to enter judgment in the amount of $13,392.60, the full cost to repair, where the building's "new" value was $50,-000, its "sound" value due to 48 percent depreciation was $26,200, but where the appraisers had entered an award of only $7,000,

or 48 percent of $13,392.60 plus interest); *Glens Falls Insurance Co. v. Gulf Breeze Cottages, Inc.,* 38 So.2d 828 (Fla.1949) (holding that the correct measure of compensation for a partial loss would be the cost of economical repair, not exceeding the value, and that "sound value" should be arrived at by replacement cost, less depreciation). In *Glens Falls,* the insurer agreed it could not depreciate the cost to repair most partial losses under Florida law, but argued that it should not be liable for the entire cost to replace almost-ten-year-old roofs with new roofs, when the roofs had originally been designed to last only ten years. In disallowing the deduction for depreciation from the cost to replace the roofs, the *Glens Falls* court cited *McIntosh v. Hartford Fire Insurance Co., supra,* and noted:

> Since the buildings were only partially destroyed, it was all the more necessary. that the roofs should be in good condition in order that the structures might remain habitable [ ]. . . .

> . . . .

> Bearing in mind that the purpose of the contract was to indemnify the owner against loss, we think the chancellor adopted a rule which was fair and just and that the property should have been placed in as nearly as possible the same condition that it was before the loss, without allowing depreciation for the materials used. Certainly it was not intended that the repairs should be made with materials which were not new. If depreciation were allowed, it would cast upon the owner an added expense which we do not believe was contemplated by the parties when they entered into the insurance contract. . . .

*Glens Falls Insurance Co. v. Gulf Breeze Cottages, Inc., supra* at 830. *Accord, Commercial Union Insurance Company v. Ryals,* 355 So.2d 684, 686 (Ala.1978). *See*

*also Gulf Ins. Co. v. Carroll,* 330 S.W.2d 227, 233–34 (Tex.Civ.App.1959).

In Pennsylvania, then, the legal definition of "actual cash value" is what it would cost to replace the entire building or other insured property at the time of the loss, which necessarily already includes a deduction for depreciation. *See Farber v. Perkiomen Mutual Ins. Co., supra* at 481–82, 88 A.2d at 777 (calculating actual cash value by subtracting the building's 60 percent depreciation from the reproduction cost new of the building immediately before the fire). Actual cash value is a calculation made with reference to the entire property insured, in other words, the property listed in the "description of property covered" section of the policy; it is not a calculation made with reference to the component parts of that property. *See Phoenix Assurance Co. of New York v. Singer,* 331 F.2d 10 (8th Cir.(Mo.) 1964) (an appraiser need only determine the actual cash value of the building as a whole because the word "item" in an appraisal form "refers to items as listed in the policy and not to a detailed specification of all of the minute elements of damage giving rise to the total damage . . . .").[6] *Accord, Commercial Union Insurance Company v. Ryals, supra* at 686.

As already noted, however, the Fair Plan policies at issue instantly included an endorsement which defined actual cash value as "the cost to *repair* or replace the damaged property less deductions for physical deterioration (depreciation) and obsolescence." (R.R. at 89a, 109a, 129a, 149a.) In support of this definition, which, according to the Facility, allows them to deduct depreciation from the cost of a *repair* in the event of a partial loss, the Facility relies upon *Gilderman v. State Farm Insurance Co.,* 437 Pa.Super. 217, 220–22, 649 A.2d 941, 943 (1994), *allocatur denied,* 541 Pa. 626, 661 A.2d 874 (1995), citing *Canulli v. Allstate Insurance Co.,* 315

---

**6.** I recognize that *Singer* addressed only whether the agreement between the insurer and the insured required the *appraisers* to determine the actual cash value of each damaged part of the building immediately prior to the fire, or only the actual cash value of the whole building. As

the *Singer* court noted, under Missouri law, if the issue of damage for partial loss were being presented to a jury, "the measure of damages remains as the difference in the value of the building before and after the damage." *Phoenix As-*

Pa.Super. 460, 462 A.2d 286 (1983).[7] To the extent that the Facility's definition of actual cash value differs from the "legal meaning of that clause" provided by our supreme court for the past sixty-seven years, and thus incorporated into § 636, the Facility's definition must yield.[8] *Farber v. Perkiomen Mutual Ins. Co., supra* at 485–87, 88 A.2d at 779. As noted *supra,* unlike the majority, I do not believe *Farber* invited insurers to alter statutorily mandated provisions in their policies of basic fire insurance coverage.

Even more troubling than the majority's acceptance of the Facility's assertion that it may re-define the term "actual cash value," however, is the logical corollary of that position; namely, that because the Legislature has not set forth the specific terms of a policy of "basic" fire insurance under the Fair Plan, insurers are apparently at liberty to write any policy of fire insurance they choose, so long as it is approved by the insurance commissioner. It is fundamental to the rules of statutory construction that, in ascertaining the legislative intent of a particular statute, it is presumed that the legislature did not intend a result that is absurd or unreasonable; nor one that favors the private over the public interest; nor one that does not take into account the occasion and necessity for the statute, the circumstances under which it was enacted, or the mischief to be remedied. 1 Pa.C.S.A. §§ 1921, 1922; *Grom v. Burgoon,* 448 Pa.Super. 616, 619–21, 672 A.2d 823, 825 (1996); *Pennsylvania Financial Responsibility Assigned Claims*

*Plan v. English,* 541 Pa. 424, 429–31, 664 A.2d 84, 87 (1995). To acknowledge that the Legislature intended to protect the investment of insureds purchasing property in high-risk neighborhoods, while at the same time arguing that the Legislature gave insurers a free hand to write any policy of fire insurance they choose is to countenance an absurd result.

Furthermore, based on the history and purpose of the Fair Plan Act, it defies logic to believe that our Legislature intended the absurd and unjust result illustrated in the following scenario: Homeowner A, who owns a home in an affluent section of a large city, purchases a policy of standard fire insurance issued in compliance with § 636. Homeowner B, who lives just across a major thoroughfare from Homeowner A, but in a high-risk neighborhood in which homeowners are attempting to renew urban property, also purchases a policy of fire insurance but does so under the Fair Plan. This policy, like the one at issue instantly, does not comply with the actual cash value provision of § 636 because it expressly allows insurers to depreciate the cost to replace *or repair* property in the event of a partial loss. During a storm, both houses are struck by lightning, causing fires which destroy their roofs. Homeowner A is entitled to the cost to repair or replace his roof, so long as that cost is less than the actual cash value of the entire house or the limits of liability of his insurance policy, whichever is less.[9] Homeowner B, however,

---

surance Co. of New York v. Singer,* 221 F.Supp. 890, 895–96 (E.D.Mo.1963).

**7.** I note, however, that the definition of "actual cash value" recited by the *Gilderman* and *Canulli* courts was *obiter dictum* in *Canulli,* the Canulli court having quashed the appeal on procedural grounds. Additionally, I note that the sources cited by the *Canulli* court do not define actual cash value as the cost to *repair or replace* less depreciation. Instead, those sources rely upon the supreme court's definition of actual cash value in *Fedas v. Insurance Company of the State of Pennsylvania, supra. See Farber v. Perkiomen Mutual Ins. Co., supra* at 485, 88 A.2d at 779 ("'Actual cash value in a policy of insurance [means] what it would cost *to replace* a building or chattel as of the date of the fire'"), quoting *Fedas v. Insurance Company of the State of Pennsylvania, supra* at 563, 151 A. at 288 (emphasis added); *Patriotic Order Sons of America Hall*

*Ass'n v. Hartford Fire Ins. Co., supra* at 112, 157 A. at 260 ("'Actual cash value means . . . the real value to *replace* []'"), quoting *Fedas v. Insurance Company of the State of Pennsylvania, supra* at 563, 151 A. at 288 (emphasis added); Lehmann, Annotation, *supra,* 8 A.L.R.4th at 551 (discussing *Fedas* which defined actual cash value as the cost *to replace* a building or chattel as of the date of the fire) (emphasis added).

**8.** *See* discussion *supra.*

**9.** According to my analysis *infra,* an insured under an "actual cash value" policy in Pennsylvania is entitled to whichever is least of: 1) the limits of liability contained in the insurance policy; 2) the actual cash value of the building as a whole, which is calculated by deducting depreciation from the cost to replace the building; and 3) the cost to repair or replace. By definition, the cost to replace a building totally destroyed by

for whom the Legislature specifically enacted protective legislation, is only entitled to the cost to repair or replace his roof after a deduction for depreciation from that cost. As a result, Homeowner A can repair or replace his roof and continue to enjoy his home, the loss insured against; while Homeowner B, who cannot afford to make up the cost of depreciation, must abandon his house, the loss insured against, because it is uninhabitable without a roof. Thus, the very mischief the Fair Plan was intended to remedy remains.

As in *Farber*, therefore, I would determine actual cash value by looking at the reproduction cost new of the *building* at the time of the fire, and then deducting from *that* cost a percentage of depreciation. *Farber v. Perkiomen Mutual Ins. Co., supra* at 481–82, 88 A.2d at 777. The items insured, the buildings, would therefore include as a part of their actual cash value the age and condition of their various component parts, including the parts destroyed or damaged. *See id.* ("Because of the building's age and condition, it had already suffered a depreciation of 60% which gave it an 'actual cash value' of $15,-774.34.").

Returning to an analysis of the policies at issue instantly, once "the actual cash value of the property" (the building or other items listed under "Description of Property Covered") "at the time of the loss," (with reference to its age, condition, use, etc.) is determined, then the extent of insurance provided by the policies in question is also ascertained, provided only that this amount be less than or equal to the amount of insurance purchased by the insured ("not exceeding the limit of liability specified in the Declarations[ ]"). (R.R. at 74a, 94a, 126a, 134a.) The risk of loss of the actual cash value of the property insured (the building) is the risk against which the insureds sought indemnity, and for which the insurer indemnified. *See*

*Farber v. Perkiomen Mutual Ins. Co., supra* at 483–84, 88 A.2d at 778 ("What the defendant companies insured against was loss to the plaintiff for damage by fire *to his building* not exceeding the amounts named in the respective policies.") (emphasis added).[10]

Having thus determined the outer limits of the insurer's liability, I would next determine the extent of the insureds' loss, returning to the language of *Fedas v. Insurance Company of the State of Pennsylvania, supra,* for guidance. As the *Fedas* court opined, the goal is "replacement as nearly as possible, or its cost. If part of a building destroyed cannot be replaced with material of like kind and quality, then it should be substantially duplicated within the meaning of the policy[,]" even if such duplication would require the use of new material. *Id.* at 563, 151 A. at 288. As the *Fedas* court continued, "The rule established by our decisions seeks a result which will enable the parties to restore the property to as near the same condition as it was in at the time of the fire, or pay for it in cash; that was the loss insured against." *Id.* at 563–64, 151 A. at 288.

In the event of a partial loss, therefore, an insured is entitled to repair or replace his property with material of like kind and quality *unless* the cost to repair or replace is greater than *either* the actual cash value *of the entire property or* the limits of liability specified in the declarations. Clearly, if the actual cash value of the *entire building* (which, as noted, is calculated by subtracting depreciation from replacement cost) is less than the cost to repair the damaged portion of the property, the insured may only recover the *building's* actual cash value. To use the automobile insurance analogy, where the cost to repair a vehicle is greater than that vehicle's book value, the vehicle is considered a total loss, and the insured receives only the book value of the car. Similarly, under an actual cash value policy, where the actual

---

fire will always be greater than or equal to the building's actual cash value, whereas the cost to repair or replace in the event of a partial loss may be less than the building's actual cash value.

**10.** The *Farber* court did not address the question whether Farber would have been entitled to the full cost to repair where, as in *Farber*, that cost

exceeded the actual cash value of the building as a whole, because the court did not have to decide that issue under the facts before it. The limits of liability in the policies were less than *either* actual cash value or cost to repair; therefore, Farber's recovery was limited to the amount of insurance he purchased.

cash value of a building is less than the cost to repair the building to restore it to its condition before the fire, the building is, in effect, a total loss, and the insured receives only the actual cash value. Finally, if the limit of liability purchased by the insured is less than the cost to repair, the insured's recovery will be defined by that policy limit.

All of the terms of the policy are thus given effect: the insured is indemnified 1) up to the limits of liability specified in the declaration; 2) to the extent of the actual cash value (replacement cost with proper deductions for depreciation/obsolescence) of the property insured (the property listed on the face of the policy); 3) but not exceeding the amount it would cost to repair or replace the property with material of like kind and quality. *See Fedas v. Insurance Company of the State of Pennsylvania, supra.*[11]

Amicus for the Facility argues, and the majority agrees, however, that the insureds instantly would receive a windfall if allowed to recover the full cost to repair or replace their partially damaged property because they would obtain premium quality replacement insurance [12] while paying only for basic coverage. (Reply brief on reargument for amicus curiae Pennsylvania Association of Mutual Insurance Companies, and Insurance Federation of America at 10–13; majority opinion at 49.) I find two major flaws with this argument. First, Fair Plan insureds would be receiving no more of a windfall than insureds under a statutorily mandated stan-

dard fire policy pursuant to § 636. More importantly, however, the loss insured against in *any* Pennsylvania actual cash value policy is the loss of the actual cash value of the *whole* property, not to exceed the cost to repair or replace the damaged part. So long as the cost to repair or replace is less than the actual cash value of the whole (which will only be true when the loss is partial), the insured is indemnified *only* for the total cost to repair or replace the damaged part; he is not entitled to the actual cash value of the whole building. Where, however, the loss is total or the cost to repair the damaged part is greater than the actual cash value of the whole, the proper measure of recovery will be the loss insured against; namely, "the actual cash value of the property [the building or other insured property] at the time of the loss," where actual cash value is defined as the cost to replace, less depreciation. (R.R. at 74a, 94a, 126a, 134a). *Fedas v. Insurance Company of the State of Pennsylvania, supra.* Because the actual cash value of a building at the time of the loss is *always* determined by taking a "proper deduction for depreciation," the most the insured can *ever* receive is the *depreciated value* of the building. Thus, depreciation is *always* considered when calculating actual cash value. That is the loss the insurer agreed to insure against in an actual cash value policy, and it is the loss upon which the insured's premiums were based: there is no windfall and there is no deluxe replacement cost insurance. The *Fedas* rule, as applied

---

**11.** *But cf. Stallo v. Insurance Placement Facility of Pennsylvania*, 359 Pa.Super. 157, 518 A.2d 827 (1986), *allocatur denied*, 515 Pa. 609, 529 A.2d 1082 (1987), in which the court found that the building's replacement cost was less than its "worth." In *Stallo*, the insured offered evidence that a building "was worth" $80,000, while the Insurance Placement Facility ("Facility"), offered no evidence to show that the building's actual value was less than $80,000. This figure may, therefore, have been the building's fair market value. Both Stallo and the Facility submitted estimates of the cost to replace the building which were less than the building's $80,000 "worth." As a result, a panel of this court found that the insured was entitled to full replacement cost of the totally destroyed building, because the replacement cost was less than the actual cash value. *Id.* at 165–67, 518 A.2d at 832. I find *Stallo* limited to its unique set of facts, in which the insurer presented *no* evidence of the build-

ing's actual cash value (replacement cost less depreciation) at the time of the loss.

**12.** Replacement cost policies provide for the full cost to repair or replace the property, with no deduction for depreciation, and in some cases even where the limit of liability is less than replacement cost, provided that, for example, the limit of liability on the face of the policy is at least 80 per cent of the full replacement cost. Keeton & Widiss, *supra*, § 3.9(c) at 212–13. In such a policy, where the limit of liability carried by the insured is less than 80 per cent of the replacement cost, the replacement provision would become inoperative. *Id.* at 213 n. 3. Some policies also require the insured to repair or replace the property before recovering replacement cost; otherwise the insurer will pay only the actual cash value of the property destroyed. *Id.* at 213.

by the *Farber* court, provides only what the parties agreed to; no more and no less.

What is missing from the record instantly, however, is any evidence of the actual cash value of the insured dwellings at the time of the fires (replacement cost less depreciation). It is therefore impossible to determine whether the trial court erred when it allowed the insureds the full cost of their repairs: if the actual cash value of the dwellings listed at R.R. 73a, 92a, 112a, and 132a were less than the cost to repair, then the insureds were only entitled to the actual cash value of those dwellings. In particular, in the case of appellees Walls and Golden, whose losses approached the limits of liability of their policies, the actual cash value of those dwellings may well have been less than the cost to repair. As a result, I would be compelled to remand to the trial court for a determination of the actual cash value of each of the insured dwellings, and for a subsequent determination of the proper amount of the award.

For all of the foregoing reasons, I respectfully dissent in that part of the majority's opinion which precludes Fair Plan insureds from obtaining standard fire policy protection.