504 A.2d 339

**Martha S. YOUNG, an Incompetent, by Clifford A. YOUNG, Her Guardian**

**v.**

**The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, Appellant.**

Superior Court of Pennsylvania.

Argued May 14, 1985.

Filed Jan. 24, 1986.

William J. Kubiak, Bradford, for appellant.

John H. Yoder, Smethport, for appellee.

Before SPAETH, President Judge, and ROWLEY and WIEAND, JJ.

## OPINION OF THE COURT

ROWLEY, Judge:

Appellee instituted an assumpsit action seeking payment under a group health plan insurance policy issued by appellant. Appellant denied liability, relying upon a custodial care limitation contained in its policy. The case was tried non-jury on January 17, 1984 and on January 30, 1984 the trial judge entered a general finding in favor of appellee and against appellant. Appellant filed exceptions to the finding; however, before they could be ruled upon, the trial judge died. The exceptions were subsequently argued be-

fore the Honorable Paul B. Greiner, P.J., Specially Presiding, and were disposed of by Order of court on the basis of the transcribed record, briefs and oral argument. The Order was accompanied by a Memorandum Opinion. Judgment was entered in favor of appellee and appellant filed this appeal. We affirm.

Appellee was an employee of Quaker State Oil Refining Corporation for twenty-five years. As such, she was insured under a group health plan policy issued by appellant. In 1970 or 1971, appellee was diagnosed as suffering from presenile dementia (Alzheimer's disease). As a result of the disease, she was given a disability termination from Quaker State in 1971; subsequently, her condition worsened. By 1975 appellee was suffering from seizures, hallucinations and was unable to feed, bathe or clothe herself. In February of 1978 appellee was involuntarily committed to the Warren State Hospital where she still resided at the time of trial.

Appellant paid appellee's hospital bills until it sent a denial of claim letter to appellee on November 24, 1980. In its letter, appellant denied liability for expenses incurred since January 1, 1980, based on a custodial care limitation contained in the policy. No further payments were made by appellant.

During appellee's stay at Warren State Hospital, her mental condition worsened. She could not communicate meaningfully and was in need of constant care to aid her in bathing, eating and dressing. During her stay at the hospital, appellee was placed in various types of therapeutic programs.

The trial court found that appellee was being treated for the stated purpose of controlling her epileptic, psychotic and violent behavior to the point where she would be suitable for eventual transfer to a custodial care facility. The court also found that appellee was being aided in achieving this goal by highly trained medical specialists.

In denying appellant's exceptions, the court held that the definition of custodial care contained in appellant's policy was ambiguous, contradictory, and against "the stated public policy of this Commonwealth." Memorandum Opinion at 3–4; See 31 Pa.Code § 89.94. To resolve the ambiguity, the court applied an interpretation utilized by the federal courts in construing the phrase "custodial care" as it appears in the Social Security Act. The court looked to *Samuels v. Weinberger*, 379 F.Supp. 120 (S.D.Ohio 1973), to define custodial care as, "care that could be administered by a layman without any possible harm to the health of the one in custody and refers to guardianship for convenience that has no significant relationship to medical care of any type." Memorandum Opinion at 2. Application of the federal interpretation to the facts in the present case led the court to conclude that the treatment received by appellee did not constitute custodial care within the limitation set forth in the policy.

In addition, the court held that appellant's payment of benefits to appellee from March, 1978 until January, 1980 constituted a waiver of the custodial care limitation because appellant failed to assert the limitation at the earliest possible time. Finally, the court held that appellant was estopped from relying upon the limitation contained in the policy by its failure to make a final decision on appellee's request for review of its decision to terminate payments within 120 days of receipt of appellee's request for review, as required by the terms of the policy.

Appellant's principal argument on appeal is that there is no evidence in the record to support the conclusion that the policy language is ambiguous. Furthermore, appellant contends that the court erred when it applied the definition of custodial care that was developed to interpret and administer federal legislation. It claims that the policy language in question is more specific than the federal definition and therefore is more restrictive than the more general federal definition. Additionally, appellant argues that the court erred by failing to determine whether alternative language, if used, would have put the matter beyond a reasonable

doubt. Appellant also argues that the court erred in finding that appellant had waived the policy limitation by its prior payments under the policy and in finding that the failure to follow the contractual review procedure estopped appellant from asserting the limitation.

It is appellee's position that the court correctly resolved all issues.

The principle issue centers around the following policy language:

CUSTODIAL CARE LIMITATION

No payment shall be made for "covered charges" incurred for custodial care. For the purposes of this limitation, expenses incurred for care comprised of accommodations (including room and board and other institutional services) and nursing services provided an insured person, because of age or other mental or physical condition, primarily to assist the insured person in the activities of daily living shall be deemed custodial care. The fact that the insured person is concurrently receiving medical service which is merely maintenance care that cannot reasonably be expected to contribute substantially to the improvement of a medical condition shall not preclude the application of this limitation.

Insurance policy at 20.

We begin our analysis, as always, by first determining the appropriate standard of review. Because neither the trial court nor Judge Greiner entered detailed findings of fact and conclusions of law, but, instead, made only general findings, we review the decision under the same standards accorded a general verdict rendered by a jury. *Merion Spring Co. v. Muelles*, 315 Pa.Super. 469, 462 A.2d 686 (1983). In reviewing the general findings of the trial court, we may affirm a correct result based on a rationale different than that utilized by the tribunal whose decision we are reviewing. *Butler v. DeLuca*, 329 Pa.Super. 383, 478 A.2d 840 (1984).

We have concluded that Judge Greiner correctly found that the custodial care limitation is not applicable on the

basis of the facts disclosed in the record; however, we reach our conclusion for reasons different than those utilized by Judge Greiner. Having reached this conclusion as to the first issue, it is unnecessary for us to pass on the waiver and estoppel claims.[1]

■ The interpretation of an insurance policy is a question of law for the court. *Adelman v. State Farm Mutual Automobile Insurance Co.,* 255 Pa.Super. 116, 386 A.2d 535 (1978). As a reviewing court, we are not bound by the trial court's conclusions of law; instead, we are free to draw our own inferences and conclusions from the facts established at trial. *Minteer v. Wolfe,* 300 Pa.Super. 234, 446 A.2d 316 (1982). In determining whether an insurance policy is ambiguous, the standard of review has been characterized as "plenary." *Pacific Indemnity Co. v. Linn,* 766 F.2d 754, 760 (3d Cir.1985). In interpreting the policy at issue we are guided by the following principles:

A contract will be found to be ambiguous:

[I]f, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends; and a contract is not rendered ambiguous by the mere

---

1. In finding waiver, Judge Greiner relied upon the fact that appellant had "paid benefits to [appellee] from March 1978 to January 1980 for which they subsequently denied coverage on the basis of the 'custodial care' limitation." Memorandum Opinion at 3. Although we decline to reach the merits of the waiver issue, we note that the aforementioned payments may be considered as evidence of the meaning that the parties placed on the limitation. *See Celley v. Mutual Benefit Health and Accident Assoc.,* 229 Pa.Super. 475, 482–483, 324 A.2d 430, 434 (1974) (In construing an ambiguous policy term, the court may attempt to arrive at a reasonable construction "in accord with the parties' apparent intention as revealed by extrinsic evidence of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract.") (citation omitted).

fact that the parties do not agree upon the proper construction.

*Commonwealth State Highway and Bridge Authority v. E.J. Albrecht Co.,* 59 Pa.Commw.Ct. 246, 251, 430 A.2d 328, 330 (1981) (Quoting 8 P.L.E. CONTRACTS § 146 (1971) ).

*Metzger v. Clifford Realty Corp.,* 327 Pa.Super. 377, 386, 476 A.2d 1, 5 (1984). "Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 304, 469 A.2d 563, 566 (1983); *Musisko v. Equitable Life Assur. Soc.,* 344 Pa.Super. 101, 496 A.2d 28 (1985), *Aetna Casualty and Surety Co. v. Drake,* 343 Pa.Super. 114, 494 A.2d 381, 382 (1985). However, "an insurer may draft a policy with explicit exclusions and the Court will uphold the plain meaning of the exclusions since a policyholder cannot reasonably expect unlimited coverage in the face of an explicit, unambiguous limitation." *Huffman v. Aetna Life & Casualty Co.,* 337 Pa.Super. 274, 486 A.2d 1330, 1334 (1984).

 In the present case, we find it unnecessary to resort to the federal interpretation of custodial care to arrive at a reasonable interpretation of the limitation clause relied on by appellant.[2] Instead, we focus our analysis on the particular language contained in the policy written and issued by appellant. The policy defines custodial care as care provided to "an insured person, because of age or other mental or physical condition, primarily to assist the insured person in the *activities of daily living....*" (Emphasis supplied.) While it may be unclear what constitutes "activities of daily living," we think it is beyond argument that the phrase applies, at least, to the basic, rudimentary tasks of daily living that most persons carry out each day, such as bath-

---

**2.** Custodial care is not defined in the Social Security Act; hence, the phrase has been interpreted by the federal courts. The Department of Health and Human Services has attempted to provide certainty in the area by promulgating federal regulations to define custodial care. *See Kuebler v. Secretary of U.S. Department of Health & Human Services,* 579 F.Supp. 1436 (D.C.N.Y.1984).

ing, dressing and eating. Furthermore, it is clear that such services *are* being provided to appellee at Warren State Hospital. Thus, we start with the proposition that appellee is receiving *some* custodial care within the meaning of the policy definition. This conclusion, however, does not end our inquiry. It is the last sentence in appellant's definition that poses a more difficult problem of construction. That sentence reads:

> The fact that the insured person is concurrently receiving medical service which is merely maintenance care that cannot reasonably be expected to contribute substantially to the *improvement* of a medical condition shall not preclude the application of this limitation. (Emphasis added.)

Thus, the last sentence of the clause, by implication at least, limits its application to those cases where "custodial care" is *not* accompanied by medical services which are expected to contribute substantially to the improvement of the insured's medical condition. In other words, if "custodial care" *is* accompanied by medical services that substantially contribute to the improvement of the insured's medical condition, the limitation is *not* applicable and coverage is provided. While we are of the opinion that this is the clear meaning of the clause, it is certainly "fairly susceptible" of such a meaning and, if there is any doubt (ambiguity) on the matter, it is resolved in favor of appellee and against appellant. Read in this light, the issue is whether the evidence before the trial court is sufficient to support its finding that the medical services being provided appellee, in addition to custodial care, are reasonably expected to substantially improve her medical condition. If so, the custodial care limitation is not applicable and appellant's expenses are covered by the terms of the policy.

In *Hrebec v. Aetna Life Insurance Co.*, 603 S.W.2d 666 (Mo.App.1980), the Court was presented with a custodial care clause that contained language similar to the one in this case. The Court was required to determine, *inter alia,* what constituted *improvement* in the insured's medical condition. *Id.* at 674. In *Hrebec,* even though there was a

custodial care exclusion, the Court construed it to mean that those medical services which *improved* the insured's medical condition must be reimbursed under the terms of the policy even though the cost of custodial care was not reimburseable.[3] *Hrebec* serves as an example of medical services that did not improve the insured's medical condition. However, the ability of the insured to respond to treatment in *Hrebec* is in stark contrast with that of the insured in the present case. The present record supports the conclusion that appellee's medical condition was reasonably expected to be substantially improved by the medical services she received at Warren State Hospital.

"Improve" is defined as: "(1) to advance to a better state or quality; make better; (2) to increase the productivity or value of...." AMERICAN HERITAGE DICTIONARY 662 (New College Ed.1980). Application of the foregoing definition to the language in question reveals that if the medical care received by appellee could be said to produce a substantial advance in appellee's medical condition, then the limitation is not applicable. This interpretation is not at odds with appellant's own approach to the meaning of the limitation. On cross-examination of appellant's physician in charge of reviewing claims, he agreed that the limitation did not require that the patient be cured. Appellant's physician framed the test as being "[w]hat benefit does the patient get from what's being done for him." (N.T. 115–116.)

During her stay at Warren State Hospital, appellee received an anticonvulsant drug, dilantin, to control her seizures and a neuroleptic medication, haldol, for the control of her psychosis and the associated symptom of agitation. (N.T. 37, 79–80.) In the past, appellee's agitation had caused her to strike out at her caretakers. (N.T. 73.) Appellee also engaged in various therapeutic programs including reality orientation, milieu therapy and therapeutic

---

**3.** No such claim has been made by appellant in this case. Appellant has consistently maintained that it is not liable for *any* of appellee's expenses. Appellant has never asserted that, even if it is liable for the cost of non-custodial services, it is excused by the limitation from paying for the cost of those services appropriately characterized as assisting in the activities of daily living.

recreation programs. (N.T. 58–60.) She also received assistance from psychiatrically trained nurses. (N.T. 41.) Appellee's case was reviewed monthly by a treatment team to determine whether she was ready to be discharged to a nursing home. (N.T. 44–45.)

Appellee's doctor testified that appellee was being treated for psychosis that was a symptom of presenile dementia. The goal of the treatment was to enable appellee to participate with nursing care and to enable her to function in a less restrictive setting, such as a nursing home. (N.T. 35.) Notably, appellee's doctor testified that while the medical services provided would not substantially improve presenile dementia, the treatment did slow down the progress of the disease and thus increased the lifespan of patients with Alzheimer's disease. (N.T. 53–55.) Appellee's doctor was questioned on cross-examination as follows:

Q. And is it also safe to say, Doctor, in the past, during the course of hospitalization, 1978 to present, there has been no substantial improvement in either her medical or psychological status?

A. Improvement is diffcult [sic] to define. There has been improvement in her behavior and basic presenting symptoms. Only thing is she is not ready to be discharged. She still needs active care. There is decline in her level of mental functioning, but there is improvement in her personal distress.

(N.T. 71–72.)

It is clear on the record before us that appellee did receive some custodial care during her stay at Warren State Hospital. The care included assistance in the activities of daily living; appellee was bathed, fed and clothed by the staff. The record also reveals that, in addition, appellee received medical services that were not merely maintenance care and that these services could reasonably be expected to contribute substantially to the improvement of appellee's medical condition.

The care received by appellee did more than maintain her. In fact, the treatment slowed down the progress of her

psychosis and extended her lifespan. Through carefully controlled dosages of haldol and assistance from psychiatrically trained nurses, appellee's agitation was checked. Appellee's doctor testified that the agitation was a primary reason for keeping appellee at the hospital. (N.T. 75.) When the agitation is brought under control, discharge proceedings would be initiated. *Id.* By increasing appellee's longevity and working towards her eventual release to a nursing home, appellee's condition was being substantially improved. The record reveals that the therapeutic programs and medication received by appellee did more than merely maintain her. The treatment stablilized her so that she could be eventually released to a nursing home facility.

Accordingly, while we find it unnecessary to resort to federal law in resolving the issue, we are satisfied that Judge Greiner did not err in finding that the custodial care limitation in appellant's policy was not applicable to appellee's circumstances and entering judgment in favor of the insured.

Therefore, we affirm.

This case was decided prior to the expiration of President Judge SPAETH's term of office.