William KANE and Dorothy Kane, his wife, William Mellinger, Noel Weiss, Michael Foster and Merrilee Foster, his wife, Keith McCall, Epiphaniana Beckham, Adnan Jaffar, Michael Raffaele and Margaret Muller, Vincent Carcia and Christine Carcia, his wife, James Miller and Elizabeth Miller, His Wife, on their own behalf and as representatives of similarly situated persons, Appellants,

v.

STATE FARM FIRE AND CASUALTY COMPANY, Allstate Insurance Company, Metropolitan Property and Casualty Insurance Company, Ace American Insurance Company, Ace Fire Underwriters Insurance Company, Markel American Insurance Company, One Beacon Insurance d/b/a Pennsylvania General Insurance Company, Keystone Insurance Company and Erie Insurance Company, Appellees.

Superior Court of Pennsylvania.

Argued May 22, 2003.

Filed Dec. 22, 2003.

Reargument Denied March 3, 2004.

Jonathan Wheeler, Philadelphia and Joseph A. Zenstein, Jenkintown, for appellants.

Mark J. Levin, Philadelphia, for Allstate.

Moira C. Duggan, Philadelphia, for Keystone Insurance.

Before: TODD, GRACI, and TAMILIA, JJ.

TODD, J.

¶ 1 In this class action,[1] Appellants, who are home owner's insurance policy holders and who have sued on their own behalf and as representatives of classes of similarly situated persons, ask us to review the order entered in the Berks County Court of Common Pleas sustaining the preliminary objections in the nature of a demurrer filed by the Appellee insurers. We affirm in part, reverse in part, and remand.

¶ 2 As this appeal comes to us following the sustaining of preliminary objections against Appellants, the following background is gleaned from Appellants' amended complaint.[2] Appellants have "replacement cost" home owner's insurance policies, separately and variously, with Appellees State Farm Fire and Casualty Company ("State Farm"), Allstate Insurance Company ("Allstate"), Metropolitan Property and Casualty Insurance Company ("Metropolitan"), Ace American Insurance Company ("Ace American"), Ace Fire Underwriters Insurance Company ("Ace Fire"), Markel American Insurance Company ("Markel"), One Beacon Insurance d/b/a Pennsylvania General Insurance Company ("One Beacon"), Keystone Insurance Company ("Keystone"), and Erie Insurance Company ("Erie"). Each of Appellants have suffered partial physical losses to buildings covered under their respective policies.

¶ 3 At the core of this present dispute is the meaning of the phrase "actual cash value," as used and, to varying degrees, defined in the replacement cost policies at issue. Appellants assert that they have not received full indemnification under their insurance policies with Appellees for their partial losses because Appellees have deducted depreciation from the actual cost to repair or replace the damaged portion of their buildings. Appellants contend that, under Pennsylvania law, unless the phrase "actual cash value" is specifically defined in an insurance policy to include depreciation, depreciation is not to be included, and a policy holder is entitled to repair/replacement cost. They assert that the definition of "actual cash value" in the policies issued by Appellees lacks the nec-

---

1. Although this litigation was commenced as a class action, it has not been certified. Under Rule 1707 of the Pennsylvania Rules of Civil Procedure, class action certification is not determined until after the pleadings are closed. As this appeal is before us following the grant of preliminary objections, the pleadings have not closed, and so class certification has not yet been determined below.

2. The original complaint filed on August 3, 2001 identified 31 separate plaintiff-insureds and 28 separate defendant-insurers. Following a court conference, the insurers supplied the insureds with copies of the applicable insurance policies. After reviewing the policies and concluding that 19 of the policies contained unobjectionable language and that the case should be discontinued as to those issuing insurers, an amended complaint was filed alleging causes of action by the present Appellants (10 insureds) and the present Appellees (9 insurers).

essary specificity, and that, as a result, Appellees breached their contracts with Appellants by failing to proffer repair/replacement costs.

¶ 4 Appellees, on the other hand, assert that the issue is one of timing: they do not dispute Appellants' entitlement to replacement cost coverage, but, rather, assert that the policies specify that Appellants must first undertake to repair or replace the damaged property before being fully compensated. Until the damage is repaired or replaced, Appellees assert that, given the definition and usage of the phrase "actual cash value" in the respective policies, Appellants are entitled only to repair/replacement cost minus depreciation.

¶ 5 Challenging Appellees' practice of deducting depreciation from Appellants' loss settlements, Appellants brought suit alleging breach of contract, insurance bad faith under 42 Pa.C.S.A. § 8371, and violation of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201–1 *et seq.* As noted, Appellants brought this suit as a class action, on their own behalf and as representatives of classes of similarly situated persons in Pennsylvania.

¶ 6 Following the filing of Appellants' amended complaint, Appellees filed preliminary objections in the nature of a demurrer to each of Appellants' causes of action, asserting, *inter alia,* that given the language of the policies at issue, Appellants had failed to allege a breach of contract.

¶ 7 On November 18, 2002, the trial court granted the preliminary objections, finding that under the policy language and Pennsylvania caselaw, Appellants had failed to allege claims for breach of contract. The court rejected Appellants' arguments that the phrase "actual cash value" could never include depreciation under Pennsylvania law, and that, as used and

defined in their respective policies, the phrase did not include depreciation. Thus, the court concluded that under the policies, Appellees were not required, in the first instance, to proffer repair or replacement costs without depreciation. For related reasons, the trial court found that Appellants had failed to allege claims for bad faith and a violation of the UTPCPL. Accordingly, the court dismissed Appellants' amended complaint. (Trial Court Order, 12/18/02.)

¶ 8 Appellants appealed this determination, and now ask: "Is an insurance company permitted to withhold depreciation from a policyholder's actual cash value payment from partial losses where the phrase 'actual cash value' is not defined in the insurance policy or where the insurance policy states that there may be a deduction for depreciation when determining actual cash value?" (Appellants' Brief at 3.)

¶ 9 Our review of an order sustaining preliminary objections is plenary. *Sunbeam Corp. v. Liberty Mut. Ins. Co.,* 740 A.2d 1179, 1183 (Pa.Super.1999). We will sustain the demurrer only if, assuming the material facts pled in the complaint to be true, "plaintiff has failed to assert a legally cognizable cause of action." *Id.* When considering the grant of preliminary objections in the nature of a demurrer, this Court must "resolve the issues solely on the basis of the pleadings; no testimony or other evidence outside the complaint may be considered." *Mellon Bank, N.A. v. Fabinyi,* 437 Pa.Super. 559, 567–68, 650 A.2d 895, 899 (1994) (citation omitted). Any doubt as to the legal sufficiency of the complaint should be resolved in favor of overruling the demurrer. *220 Partnership v. Philadelphia Electric Co.,* 437 Pa.Super. 650, 654, 650 A.2d 1094, 1096 (1994).

¶ 10 Further, to support a claim for breach of contract, "a plaintiff must plead: 1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damage." *Presbyterian Medical Center v. Budd*, 832 A.2d 1066, 1070 (Pa.Super.2003). There is no dispute in this case that elements one and three have been pled sufficiently. At issue, therefore, is whether Appellants have pled sufficiently a duty on the part of Appellees.

¶ 11 Whether a contract imposes a duty is a matter of contract interpretation. In turn, interpretation of an insurance contract is a matter of law. *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999). Our standard of review, therefore, is plenary. *Young v. Equitable Life Assurance Soc'y of the United States*, 350 Pa.Super. 247, 252, 504 A.2d 339, 341 (1986). In interpreting the language of an insurance policy, the goal is "to ascertain the intent of the parties as manifested by the language of the written instrument." *See Madison*, 557 Pa. at 606, 735 A.2d at 106. Indeed, our Supreme Court has instructed that the "polestar of our inquiry ... is the language of the insurance policy." *Id.*

¶ 12 Furthermore, when construing a policy, "[w]ords of common usage ... are to be construed in their natural, plain and ordinary sense ... and we may inform our understanding of these terms by considering their dictionary definitions;" where "the language of the [policy] is clear and unambiguous, a court is required to give effect to that language." *Id.* at 606–608, 735 A.2d at 106–108 (citations omitted). However, "[w]here a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." *Id.* at 606, 735 A.2d at 106. Thus, while a court will not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity", it must find that "contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Id.*

¶ 13 We begin by reviewing the relevant language of the policies at issue. Each of the policies is a replacement cost policy, but each, Appellees assert, requires the insured first to endeavor to repair or replace damage before full replacement costs will be proffered. The policies refer to "actual cash value" as the compensation that will be provided until repairs are completed, and, to varying degrees, the policies define "actual cash value" as including a deduction for depreciation. In order to facilitate our analysis of these policies, we break them into three groups. In the first group, comprised of the State Farm, Keystone, Ace American, and One Beacon policies, the policies are silent as to the definition of "actual cash value." In relevant part, the State Farm policy provides:

a. We will pay the cost to repair or replace ... subject to the following:

(1) until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property ...;

(2) when the repair or the replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property ...;

(State Farm Policy, at 11 (R.R. 35a).) The Keystone and Ace American policies provide as follows:

(4) [W]e will pay no more than the actual cash value of the damage unless:

(a) actual repair or replacement is complete; or

(b) the cost to repair or replace the damage is both:

(i) less than 5% of the amount of insurance in this policy on the building; and

(ii) less than [$2500 in ACE American; $1000 in Keystone].

(Keystone Policy, Endorsement HO–3, at 10–11 (R.R. 73a–74a); Ace American Policy, at 7 (R.R. 54a).) Finally, the One Beacon policy provides:

(4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above [which pay the replacement cost "without deduction for depreciation" of the part of the building damaged].

However, if the cost to repair or replace the damage is both:

(a) less than 5% of the amount of the insurance in this policy on the building; and

(b) less than $2500,

we will settle the loss according to the provisions of b.(1) and (b).2 above whether or not actual repair or replacement is complete.

(One Beacon Policy, at 8 (R.R. 66a).)

¶ 14 In the second group, comprised of the Allstate, Metropolitan, Ace Fire, and Markel policies, the policies explicitly refer to depreciation as a deduction from "actual cash value." The Allstate policy provides as follows:

b) Actual Cash Value. If you do not repair or replace the damaged, destroyed or stolen property, payment will be on an actual cash value basis.

This means there may be a deduction for depreciation....

You may make claim for additional payment as described in paragraph c, and paragraph d if applicable, if you repair or replace the damaged, destroyed or stolen covered property within 180 days of the actual cash value payment.

(Allstate Policy, at 17 (R.R. 39a).) The Metropolitan policy provides:

b. [W]e will not pay more than the actual cash value of the damage to the structure until actual repair or replacement is complete. You may make a further claim within 180 days after the loss, provided you still have an insurable interest in the property, for any additional liability based on the replacement cost value at the time of the loss.

Actual cash value means there may be a deduction for depreciation.

(Metropolitan Policy, Endorsement H303, at 2 (R.R. 50a).) The Ace Fire policy provides:

You can make a claim for loss or damage to a building based solely on the replacement cost of the damage less depreciation. If you then repair or replace the damaged property and the amount you received does not cover your loss, you may make a claim for the rest of your loss based on the replacement cost basis. The claim must be made, however, within 180 days from the date of the loss.

(Ace Fire Policy, at 2 (R.R. 57a).) Finally, the Markel policy provides as follows:

d) if "you" repair or replace the damaged property for the same use and on the same or contiguous site, "we" will pay the amount actually and necessarily spent to repair or replace such property to a condition and ap-

pearance similar to that which existed at the time of the loss.

\* \* \*

e) If "you" decide not to repair or replace under paragraph d) above, the settlement will be made according to Actual Cash Value. This means there may be a deduction for depreciation.

(Markel Policy, Endorsement ML-255 (R.R. 63a).)

¶ 15 We place the remaining policy, the Erie policy, in its own category, as the interrelation of the primary policy language and the endorsement is more complicated, and affects the interpretation and meaning of "actual cash value". The Erie policy states, in the main body:

(8) **LOSS SETTLEMENT**

The following types of losses will be settled on an actual cash value basis. This means that we will deduct for depreciation.

Losses to:

- property insured under *Personal Property Coverage*
- structures that are not buildings or carports
- carpeting
- household appliances
- cloth awnings
- outdoor antennas and outdoor equipment, whether or not attached to buildings
- insured buildings and structures which do not meet the requirements for a replacement cost settlement described below.

The actual cash value will be determined at the time of the loss. Payment will not exceed the amount necessary to repair or replace the damaged property.

**Dwelling and Other Structures Coverage**

Loss under *Dwelling Coverage or Other Structures Coverage* will be settled by one of the following methods:

1. REPLACEMENT COST SETTLEMENT (meaning we will not deduct for depreciation):

\* \* \*

2. LESS THAN FULL REPLACEMENT COST SETTLEMENT

If full replacement cost settlement does not apply, we will pay the larger of the following amounts, but not exceeding the amount of insurance under this policy applying to the building:

a. the actual cash value of that part of the building damaged; or

\* \* \*

We will pay no more than actual cash value of the damage until the actual repair or replacement is completed. . . .

You may disregard the replacement cost provision and make claim for loss or damage to buildings on an actual cash value basis.

You have the right to make claim, within 180 days after the loss, for any additional amounts we will be required to pay under this *Loss Settlement* provision.

(Erie Policy, at 11 (R.R. 158a).) The Erie endorsement adds the following language, in relevant part:

8. Loss Settlement

2. Under *Dwelling Coverage* loss will be settled on a replacement cost basis, without deduction for depreciation. Payment will not exceed the smallest of the following amounts:

— the replacement cost of that part of the dwelling damaged for equivalent construction and use on the same premises;

— the amount actually and necessarily spent to repair or replace the damaged dwelling.

ALL OTHER PROVISIONS OF THE POLICY APPLY.

(Erie Policy Dwelling Replacement Cost Guarantee Endorsement HP–BK (R.R. 159a).) [3]

¶ 16 We now turn to a review of the meaning of the phrase "actual cash value" because, as we have noted, the usage and meaning of this phrase is at the heart of the present dispute. Analysis of the phrase has a long history in the courts of this Commonwealth. In *Fedas v. Insurance Co. of the State of Pennsylvania*, 300 Pa. 555, 151 A. 285 (1930), our Supreme Court first comprehensively addressed the meaning of this phrase in an insurance policy. In *Fedas*, the Court considered whether an insurer could deduct depreciation in the event of a partial loss under a fire insurance policy. The policy allowed compensation for "[a]ctual cash value (ascertained with proper deductions for depreciation) on the property at the time of loss or damage, but not exceeding the amount which it would cost to repair or replace the same with materials of like kind and quality within a reasonable time after such loss or damage." *Id.* at 561, 151 A. at 287. The Court stated that "in ascertaining the loss resulting from the partial burning of a building, the true result is to be reached by taking the cost of reconstruction according to the conditions existing and lawfully imposed at the time when the fire occurred." *Id.* The Court explained that "actual cash value" was not the same as market value, which would incorporate depreciation, but rather was akin to replacement cost:

Generally speaking, 'actual cash value' does not mean market value, as the term is understood. 'Market value,' as here urged, embidies [sic] what a purchaser willing to buy feels justified in paying for property which one is willing but not required to sell. 'Market value' includes factors of time, place, circumstance, use, and benefit; depreciation is included, but one figure is the result of these considerations, the price to be paid. Ordinarily actual cash value has no relation to any of these factors; it is value under all times, such as the cost of manufacturing or building or book value. The policy intended something different from market value; the latter includes 'depreciation,' while the 'actual cash value' of the policy is to be diminished by 'depreciation.' *Actual cash value in a policy of insurance means what it would cost to replace a building or a chattel as of the date of the fire.*

Where a building is entirely destroyed, the application of the rule is simple; where a building is partically [sic] destroyed, it may be difficult to arrive at actual cash value, less depreciation if it is to be considered; but difficulties cannot prevent the right to compensation. *There enters into actual cash value of the part destroyed the fact that it was a part of an entire property and the use made of it. It is summed up in the idea 'the cost of replacing in as nearly as possible the condition as it existed at the date of the fire.'*

*Id.* at 562–63, 151 A. at 288 (emphasis added). The Court concluded that, regardless of the reference to depreciation deductions, the insured was entitled to replacement cost, as this was the only rec-

---

**3.** This endorsement was omitted from Appellants' amended complaint but attached to Erie's preliminary objections.

ompense that could make the insured whole under the circumstances:

The actual cost of new material, with deduction for depreciation, which is not sufficient to replace the building as nearly as it could be as of the date of the fire, does not comply with the policy, which was to insure against loss not exceeding the amount named in the insurance.

... The result reached is that called for in the policy—replacement as nearly as possible, or its cost. If part of the building destroyed cannot be replaced with material of like kind and quality, then it should be substantially duplicated within the meaning of the policy.

... To sum up, 'actual cash value' means the actual value expressed in terms of money of the thing for the purpose for which it was used; in other words, the real value to replace. The rule established by our decisions seeks a result which will enable the parties to restore the property to as near the same condition as it was at the time of the fire, or pay for it is [sic] cash; that was the loss insured against....

*Id.* at 563–64, 151 A. at 288. Thus, under *Fedas*, where an insured suffers a partial loss and is promised "actual cash value," he is entitled to replacement cost, without deduction for depreciation.

¶ 17 In *Farber v. Perkiomen Mut. Ins. Co.*, 370 Pa. 480, 88 A.2d 776 (1952), the Supreme Court again addressed the propriety of depreciation deductions with regard to a partial loss under a fire insurance policy. With language similar to that in *Fedas,* the policy at issue in *Farber* insured against loss "to the extent of the actual cash value of the property at the time of the loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time

after such loss." *Id.* at 486, 88 A.2d at 779. The insured suffered a partial loss and, while the cost of labor and materials necessary to restore the building was more than the policy limit, the depreciated value was less than the limit, and the insurer offered only the depreciated value. The Court concluded that, under *Fedas* and other decisions of the Court, the insured was entitled to full replacement cost (up to the policy limit), without deduction for depreciation. *Id.* at 486, 88 A.2d at 779. Indeed, the Court added that, in the absence of a change by the insurers to their policies, no other result was allowable:

The legal meaning of ["actual cash value"] having been determined and established by prior decisions of this court, we cannot now depart therefrom without impairing the obligation of the contracts as written. Nor is there any legally meritorious basis for suggesting the necessity for a change in the interpretation of the contracts. The defendant companies prepare their own policy forms and presumably exclude therefrom anything for which they desire not to assume liability. Moreover, insurance companies are, of course, conversant with the germane court decisions.... Any change in the defendants' policies in order to avoid in the future the impact of our prior decisions is for them to ponder. What they presently seek cannot justly be accorded by court decision.

*Id.* at 486–87, 88 A.2d at 779. Thus, where a policy promises "actual cash value," the insured is entitled to replacement cost. *See also Judge v. Celina Mut. Ins. Co.,* 303 Pa.Super. 221, 227–228, 449 A.2d 658, 661 (1982) (quoting with approval the language from *Fedas* that "[a]ctual cash value in a policy of insurance means what it would cost to replace a building or a chattel as of the date of the fire.")

¶ 18 The significance of the final admonition in *Farber* was apparent in this Court's decision in *London v. Insurance Placement Facility of Pennsylvania*, 703 A.2d 45 (Pa.Super.1997) (*en banc*). There, the Court addressed whether the Insurance Placement Facility of Pennsylvania, which offered fire insurance policies under the Pennsylvania Fair Plan Act,[4] should be permitted to depreciate the cost of repairing a building partially destroyed by fire. The policy in question compensated for losses "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property." *Id.* at 47 (emphasis omitted). The phrase "actual cash value" was defined in the policy as "the cost to repair or replace the damaged property less deductions for physical deterioration (depreciation) and obsolescence." *Id.* (emphasis omitted). The insureds asserted that Pennsylvania caselaw prohibited the insurers from deducting depreciation in a partial loss situation under a standard fire policy. While admitting that the insureds "may be correct," *id.* at 48, the Court rejected their contention that a Fair Plan Act policy was the equivalent of a standard fire policy. *Id.* at 48–49. Moreover, the Court held that the insurers had responded to the invitation of the Supreme Court in *Farber*, *supra*, to tailor their policies and clarify their coverage:

> The *Farber* decision arguably prevents insurance companies from deducting depreciation in the event of a partial loss that does not exceed the depreciated value of the whole property. If the companies wanted to avoid such a result, the court plainly suggested that they should modify their policies.

As the endorsement defining "actual cash value" demonstrates, the Facility has done exactly what the *Farber* court advised. Presumably dissatisfied with the interpretation of "actual cash value" by the court, the Facility sought to define the phrase with greater precision. Especially when the high-risk associated with insuring property under the Fair Plan is considered, it is logical that the Facility would choose to protect itself with specific definitions of terms or phrases. Finally, it is an extremely unremarkable choice when one considers that our Supreme Court invited insurance companies to do this in *Farber*.

*Id.* at 50 (footnote omitted). *London* stands for the proposition that, although *Fedas* and *Farber*, *supra*, remain viable, explicit policy language may avoid their effects.

¶ 19 From these cases, we conclude that in partial loss situations, in the absence of clear language to the contrary, an insurer may not deduct depreciation from the replacement cost of a policy and that the phrase "actual cash value" may not be interpreted as including a depreciation deduction, where such deduction would thwart the insured's expectation to be made whole. Where qualifying language is absent and an insured is promised "actual cash value," the insured is entitled to the cost to repair or replace the damaged property. Under *Fedas* and *Farber*, *supra*, our Supreme Court asserts that such compensation is the only thing that can make an insured whole. *London*, *supra*, holds that a different result can be contracted for, but the policy must be clear in that regard.

---

4. 40 Pa.C.S.A. §§ 1600.101–.502. As a response to urban riots in the 1960s, the Fair Plan Act "requires each insurer that writes property insurance in this Commonwealth to participate in providing insurance for high-risk property for which insurance is not normally available." *London*, 703 A.2d at 48.

¶ 20 Appellees cite to *Canulli v. Allstate Ins. Co.*, 315 Pa.Super. 460, 462 A.2d 286 (1983) and *Gilderman v. State Farm Ins. Co.*, 437 Pa.Super. 217, 649 A.2d 941 (1994), for the proposition that "actual cash value" can only mean the cost of repair or replacement minus depreciation. We find Appellees' reliance on these cases to be misplaced. It is true that in *Canulli* this Court, inexplicably citing *Farber, supra*, states that "actual cash value" includes depreciation. *See Canulli*, 315 Pa.Super. at 462, 462 A.2d at 287 (" 'Actual cash value' is the actual cost of repair or replacement less depreciation."). Putting aside that this assertion is in direct contravention to the holding in *Farber*, we note that the *Canulli* Court ultimately quashed the appeal by the insureds in that case as interlocutory, thus rendering the Court's definition of actual cash value nonbinding *dictum*. *See London*, 703 A.2d at 58 n. 7 (Ford Elliott, J., concurring and dissenting); *see generally T.B. v. L.R.M.*, 753 A.2d 873, 883 n. 2 (Pa.Super.2000) (dictum is not binding on this Court or trial courts), *aff'd* 567 Pa. 222, 786 A.2d 913 (2001).

¶ 21 In *Gilderman*, this Court likewise stated that "actual cash value" is "the actual cost of repair or replacement less depreciation." *Gilderman*, 437 Pa.Super. at 221, 649 A.2d at 943. The Court cited only *Canulli* for this proposition, and we note that repetition does not elevate

assertions that are otherwise dictum into binding precedent. *See Commonwealth v. Perry*, 568 Pa. 499, 529, 798 A.2d 697, 715 (2002) (Castille, J., concurring) (*"Dicta* is not converted into binding constitutional precedent through repetition.") Moreover, the Court in *Gilderman* was not strictly concerned with the issue of depreciation; rather, there, the insurer asserted that "actual cash value" included both depreciation *and* a flat 20% fee (allegedly corresponding to contractor overhead). *Gilderman*, 437 Pa.Super. at 221, 649 A.2d at 943. As the insurers were not alleging that they were "entitled to full repair or replacement costs without a depreciation deduction prior to actual repair or replacement," the definition of "actual cash value" was not directly relevant. *Id.* at 222, 649 A.2d at 943. Thus, we are not persuaded by Appellees' citation to these cases.

¶ 22 Turning now to the policies at issue in the instant case, we note that absent from *Fedas, Farber*, and *London*, however, is the situation present herein which involves not the denial of liability for replacement cost, but the timing of that compensation. The trial court noted that Appellees "have never denied liability or failed to guarantee reimbursement for the repair or replacement of the lost personal property."[5] (Trial Court Opinion, 3/18/02, at 11.) Rather, Appellees maintain that they are only liable for such costs once replacement or repair is completed.[6] Un-

---

**5.** Nor have Appellants sought such coverage. As the trial court explained:

> There are no facts offered that the [Appellants] actually completed the repairs or replacements to their respective properties, that they ever contracted to make the repairs or replacements, or that they ever even intended or attempted to repair or replace said property. Furthermore, this is no allegation that [Appellants] ever advised the [Appellees] that they wanted to make appropriate repairs, or that they submitted

> documentation to the [Appellees] showing that any repairs were made.

(Trial Court Opinion, 3/18/02, at 7–8.)

**6.** The trial court noted in its Opinion that Appellees:

> have represented to this Court, in their pleadings as well as at oral argument, that even if [Appellants] did intend to repair or replace their claimed losses, *they would not be required to expend their own funds* up front to effectuate the repairs. To the contrary, once the [Appellants] undertake to

like *Fedas*, *Farber*, and *London*, wherein the insurers contested liability for such replacement costs without including depreciation, here, only the timing of such payments is at issue.[7] Thus, the policy considerations underlying these cases—that an insured should be made whole, and that in the absence of language to the contrary, to make an insured whole "actual cash value" must be interpreted to mean replacement value without depreciation—apply with less force herein as there is no question that Appellants will be made whole by Appellees ultimately, if not initially.

¶ 23 In light of the foregoing, and after a review of the nine policies at issue, we conclude that, with the exception of Erie which we discuss further below, Appellants have failed to allege breach of contract claims against Appellees. We begin by discussing the policies in the second group.

 ¶ 24 These policies—issued by Allstate, Metropolitan, Ace Fire, and Markel—clearly note that compensation will be paid out on an actual cash value basis which "may" include a deduction for depreciation (*see* Allstate Policy, at 17 (R.R. 39a); Metropolitan Policy, Endorsement H303, at 2 (R.R. 50a); Markel Policy, Endorsement ML–255 (R.R. 63a)), or that compensation will be "less depreciation" (*see* Ace Fire Policy, at 2 (R.R. 57a)). Like the insurer in *London*, *supra*, Allstate, Metropolitan, Ace Fire, and Markel appear to have followed the Supreme Court's advice in *Farber* and have tailored their policies to clarify the extent of their intended coverage. We find no merit to Appellants' assertion that the use of "may"

make the appropriate repairs or replacements, for example, by contracting to do so, these *insurers would pay the full cost of repairing or replacing the property.* (Trial Court Opinion, 3/18/02, at 8 n. 4)(emphasis original.)

makes the policies ambiguous or misleading.

¶ 25 Moreover, and more persuasively, when read in the context of the language of the policies at issue, we conclude, as did the trial court, that the phrase "actual cash value" as used in those policies cannot mean replacement value, as Appellants contend, as such an interpretation would make the remaining policy language nonsensical. In each of these policies, there is qualifying language indicating that "actual cash value" will be the proffered compensation where the insured does not repair or replace the damage. (*See* Allstate Policy, at 17 (R.R. 39a) ("*If you do not repair or replace the damaged, destroyed or stolen property,* payment will be on an actual cash value basis." (emphasis added)); Metropolitan Policy, Endorsement H303, at 2 (R.R. 50a) ("[W]e will not pay more than the actual cash value of the damage to the structure *until actual repair or replacement is complete.*" (emphasis added)); Ace Fire Policy, at 2 (R.R. 58a) ("*If you then repair or replace the damaged property* and the [depreciated cost] does not cover your loss, you may make a claim for the rest of your loss based on the replacement cost basis." (emphasis added)); Markel Policy, Endorsement ML–255 (R.R. 63a) ("*If 'you' decide not to repair or replace* under paragraph d) above, the settlement will be made according to Actual Cash Value." (emphasis added)).) Thus, "actual cash value" cannot also mean "replacement value." Given that the policies have defined "actual cash value" to include deductions for depreciation, we find that the policies unambiguously allow the insurers

7. Appellants have not asserted that this two-step process, in itself, is contrary to Pennsylvania caselaw or public policy. We, therefore, offer no opinion in that regard.

to deduct depreciation until repair or replacement is made.

¶ 26 Moreover, with respect to these policies, there is no concern, as was present in *Fedas* and *Farber, supra*, that the insureds will not be made whole. Here, Appellees have conceded liability for replacement cost once Appellants undertake to repair or replace the damage to their properties. Again, the issue is one of the timing of compensation, not its extent.

¶ 27 We come to the same conclusion regarding the policies in the first group. These policies—issued by State Farm, Keystone, Ace American, and One Beacon—do not contain any definition for "actual cash value." When read in the context of the language of the policies, however, we note, as we did for the policies in the second group, that the phrase "actual cash value" as used in those policies cannot be synonymous with replacement value, as Appellants contend, as such an interpretation would make the remaining policy language nonsensical. The language of these policies is clear that only "actual cash value" will be proffered "until" or "unless" repair or replacement is made. (*See* State Farm Policy, at 11 (R.R. 35a) (*"until actual repair or replacement is completed*, we will pay only the actual cash value at the time of the loss" (emphasis added)); Keystone Policy, Endorsement HO–3, at 10–11 (R.R. 73a–74a) ("we will pay no more than actual cash value of the damage *unless . . . actual repair or replacement is complete*" (emphasis added)); Ace American Policy, at 7 (R.R. 54a) (same); One Beacon Policy, at 8 (R.R. 66a) ("We will pay no more than the actual cash value of the damage *until actual repair or replacement is complete*." (emphasis added)).)

¶ 28 Appellants do not assert that the phrase "actual cash value" as used in these policies is ambiguous; rather, they assert

that it may not include a deduction for depreciation. We disagree. The only interpretation of the phrase "actual cash value" in these policies that makes sense is one that includes depreciation deductions. Moreover, this interpretation does not run afoul of *Fedas* and *Farber, supra*, as, under these policies, the insureds ultimately will be made whole. That is, as in the policies in the second group, there is no concern here, as was present in *Fedas* and *Farber*, that the inclusion of depreciation deductions will not fully compensate the insured.

¶ 29 We finally address the policy issued by Erie, which we have quoted at length above. While the policy clearly defines, in one section, "actual cash value" to mean that Erie "will deduct for depreciation," (Erie Policy, at 11 (R.R. 158a)), and while the policy states that Erie "will pay no more than actual cash value of the damage until the actual repair or replacement is completed" (*id.*), we find that the interrelation between the primary policy language and the endorsement language results in an ambiguity. First, as Appellants point out, the definition of "actual cash value" is prefaced with language indicating that it applies only to "the following types of losses" which specifically exclude dwelling damage as alleged herein. (*Id.*) Second, while later language in the "LOSS SETTLEMENT" section indicates that Erie "will pay no more than actual cash value of the damage until the actual repair or replacement is completed" (*id.*), it is unclear whether this phrase applies to dwelling damage once the endorsement language is overlaid. Specifically, the endorsement, which is entitled "DWELLING REPLACEMENT COST GUARANTEE ENDORSEMENT," specifically indicates that dwelling coverage "will be settled on a replacement cost basis, without deduction for depreciation." (Erie Policy Dwelling

Replacement Cost Guarantee Endorsement HP–BK (R.R. 159a).)

¶ 30 While it is reasonable to infer, as Appellees argue, that regardless of the endorsement, the provision in the main policy which indicates that only actual cash value will be offered until repair or replacement is complete remains, we conclude it is equally reasonable for a policy holder to interpret the policy, as Appellants suggest, to mean that replacement cost is to be paid in the first instance without depreciation deductions. As there are two reasonable interpretations of the policy language, we must apply the interpretation favoring the insureds. *See Madison*, 557 Pa. at 606, 735 A.2d at 106. At any rate, this ambiguity convinces us that it was error for the trial court to dismiss the breach of contract claim against Erie at this early preliminary objection stage of the litigation. *See 220 Partnership v. Philadelphia Elec. Co.*, 437 Pa.Super. at 654, 650 A.2d at 1096 (doubts as to the legal sufficiency of the complaint should be resolved in favor of overruling the demurrer).

¶ 31 For all the foregoing reasons, we conclude that the trial court properly dismissed the breach of contract claims against each of the Appellees, except for Erie, and accordingly affirm the order as to those Appellees. For the same reasons, we conclude the trial court properly dismissed Appellants' related claims under the UTPCPL, again, except as against Erie, and accordingly affirm the order as to those Appellees. We conclude, however, that the trial court erred in dismissing the breach of contract claim against Erie, and reverse the order below in that regard. Given that the trial court dismissed the UTPCPL claim against Erie based on an erroneous conclusion that the underlying breach of contract claims were meritless, we remand for the trial court to re-

consider the UTPCPL claim against Erie in light of this opinion. Appellants have not challenged the dismissal of their bad faith claims against Appellees, and thus we do not disturb the trial court's determination in that respect.

¶ 32 Order **AFFIRMED** as to Appellees State Farm Fire and Casualty Company, Allstate Insurance Company, Metropolitan Property and Casualty Insurance Company, Ace American Insurance Company, Ace Fire Underwriters Insurance Company, Markel American Insurance Company, One Beacon Insurance, and Keystone Insurance Company. Order **REVERSED** as to Appellee Erie Insurance Company. Case **REMANDED** for proceedings consistent with this opinion. Jurisdiction **RELINQUISHED**.

¶ 33 GRACI, J. files a Concurring and Dissenting Statement.

GRACI, J., Concurring and Dissenting.

¶ 1 In typical fashion, the Opinion of the majority provides a thorough and compelling analysis of the complicated factual and legal issues presented in this case. I join its analysis and expression of the law in its entirety and differ from my esteemed colleagues only in the application of the law to the case against Erie.

¶ 2 The learned majority appropriately cites *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999), for the proposition that a court "must find that 'contractual terms are ambiguous if they are subject to more than one reasonable interpretation *when applied to a particular set of facts.*' " Opinion, at 1042 (emphasis added). In my view, under the particular set of facts present in this case, the contractual terms which the majority finds ambiguous are not subject to more than one reasonable interpretation. Like the language in the

**1052**

other policies which the majority concludes yields a different result, the language of the Erie policy, under the particular facts present here, requires actual replacement before replacement value is due. The language in the Erie policy is the functional equivalent of that found sufficient in the other policies. Accordingly, in my view, the result should be the same. I would, therefore, affirm the order of the trial court in its entirety.