[J-3AB-2020]

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| KONRAD KURACH, | : | No. 12 EAP 2019 |
| | : | |
| Appellant | : | Appeal from the Order of Superior |
| | : | Court entered on August 24, 2018 at |
| | : | No. 1726 EDA 2017 reversing the |
| v. | : | Order of the Court of Common Pleas |
| | : | of Philadelphia County, Civil |
| | : | Division, entered on April 21, 2017 |
| TRUCK INSURANCE EXCHANGE, | : | at No. 00339 July Term, 2015 and |
| | : | remanding. |
| Appellee | : | |
| | : | ARGUED: March 10, 2020 |
| | : | |
| MARK WINTERSTEEN, INDIVIDUALLY | : | No. 13 EAP 2019 |
| AND ON BEHALF OF ALL OTHERS | : | |
| SIMILARLY SITUATED, | : | |
| | : | Appeal from the Order of Superior |
| | : | Court entered on August 24, 2018 at |
| Appellant | : | No. 1730 EDA 2017 reversing the |
| | : | Order of the Court of Common Pleas |
| | : | of Philadelphia County, Civil |
| v. | : | Division, entered on April 21, 2017 |
| | : | at No. 03543 July Term, 2015 and |
| | : | remanding. |
| TRUCK INSURANCE EXCHANGE, | : | |
| | : | ARGUED: March 10, 2020 |
| Appellee | : | |

## OPINION

**JUSTICE TODD**                    **DECIDED: August 18, 2020**

In these consolidated appeals, we consider the question of whether, under the terms of the "replacement cost coverage" policies at issue, the insurer was permitted to withhold from any actual cash value ("ACV") payment general contractor's overhead and

profit ("GCOP") expenses, unless and until the insureds undertook repairs of the damaged property, even though the services of a general contractor were reasonably likely to be needed to complete the repairs. After careful review, we affirm the order of the Superior Court, which found the insurer was entitled to withhold such costs.

## I. Facts and Procedural History

Appellants Konrad Kurach and Mark Wintersteen ("Policyholders") each purchased identical "Farmers Next Generation" insurance policies from Appellee Truck Insurance Company ("Insurer"), to cover their residential dwellings situated in Pennsylvania.[1] Further, each paid Insurer an additional premium for "replacement cost coverage."[2] Subsequent to the purchase of these policies, both Policyholders sustained water damage to their houses in excess of $2,500, and both filed claims with Insurer under the policies.

The policies provide a "two-step" settlement process governing the manner in which Insurers would handle property damage claims of this nature, as described in Section 5 of the policies, the relevant portion of which provides:

### 5. How We Settle Covered Loss

a. Coverage A (Dwelling) and Coverage B (Separate Structures). We will only settle covered loss or damage on the basis of use as a private residence.

(1) Settlement for covered loss or damage to the dwelling or separate structures will be settled at replacement cost,

---

[1] Appellant Wintersteen's policy became effective November 13, 2013, and Appellant Kurach's policy went into effect on May 22, 2014.

[2] Although the policies at issue in this matter do not explicitly define "replacement cost coverage," this type of coverage, as a general matter, "allows recovery for the actual value of property at the time of loss, without deduction for deterioration, obsolescence, and similar depreciation of the property's value." 12A Couch on Insurance § 176:56; *see also* *Carulli v. Allstate Insurance Company*, 462 A.2d 287, 287 (Pa. Super. 1983).

without deduction for depreciation, for an amount that is reasonably necessary, for the lesser of the repair or replacement of the damaged property, but for no more than the smallest of the following:

(i) the applicable stated limit or other limit of insurance under this policy that applies to the damaged or destroyed dwelling or separate structure(s);

(ii) the reasonable replacement cost of that specific part of the dwelling or separate structure(s) damaged for equivalent construction with materials of like kind and quality on the residence premises, determined as of the time of loss or damage;

(iii) the reasonable amount actually necessarily spent to repair or replace the damage to the dwelling or separate structure(s); or

(iv) the loss to the interest of the insured in the property.

Reasonably necessary replacement cost does not include damage to property otherwise uninsured or excluded under this policy.

When the cost to repair or replace damaged property is more than $2,500, we will pay no more than the actual cash value of the loss until actual repair or replacement is completed. If the dwelling or a separate structure is rebuilt or replaced at a different location, the cost [sic] described in subsection (ii) above are limited to the costs which would have been incurred if the dwelling or separate structure had been built or replaced at its location on the resident's premises.

* * *

e. General contractor fees and charges will only be included in the estimated reasonable replacement costs if it is reasonably likely that the services of a general contractor will be required to manage, supervise and coordinate the repairs. However, actual cash value settlements will not include estimated general contractor fees or charges for general contractor's services unless and until you actually incur and pay such fees and charges, unless the law of your state requires such fees and charges be paid with the actual cash value settlement.

Truck Insurance Policy ("Policy") (Exhibit A to Wintersteen Amended Class Action Complaint, 10/2/15) at 34-35 (R.R. 139a, 141a).[3] Furthermore, the policies define "actual cash value" as

> the reasonable replacement cost at time of loss less deduction for depreciation and both economic and functional obsolescence.

Policy at 6 (R.R. 111a).

Thus, where, as here, the cost of repairing or replacing a policyholder's damaged property exceeds $2,500, Insurer is first required to pay the ACV of the property at the time of the loss to the policyholder ("step one"). Once the repair or replacement of the damaged property is commenced, Insurer is then obligated (in "step two") to pay the depreciated value of the damaged property and also the expense of hiring a general contractor,[4] "unless the law of [Pennsylvania] requires" payment of GCOP as part of ACV. It is this latter condition which is the core of the dispute between the parties.

Insurer paid Policyholders' claims in accordance with this two-step process. Specifically, after Policyholders utilized their own claims' experts to prepare estimates of the costs of repair and replacement of the damaged property, which, given the nature of

---

[3] As noted, the policies at issue are identical. For ease of reference, our citations are to the Wintersteen policy.

[4] As indicated, *supra*, GCOP is an acronym for "general contractor's overhead and profit." As explained more fully by a trade journal of public insurance adjusters: "Overhead expenses represent those costs incurred by a general contractor to operate its business, but are not attributable to any one specific job." *Overhead and Profit: Its Place in a Property Insurance Claim* at 2, Adjusting Today (2007), available at https://www.adjustersinternational.com/publications/adjusting-today/overhead-and profit/1. These include such things as administrative expenses attendant to running the general contractor's business office, licenses and fees, salaries and benefits of office personnel, and advertising. *Id.* The general contractor's profit is a percentage of the total cost of construction, and the percentage commonly used in the insurance industry is 20 percent. *Id*

the loss, included the services of a general contractor, and Policyholders requested payment of these estimated costs, Insurer tendered to both Policyholders a "step one" payment for the ACV of the damaged property. This payment did not include an amount for depreciation of the property, nor did it include any amount for GCOP, even though Insurer conceded, and does not now dispute, that the services of a general contractor would be reasonably necessary for the completion of the repairs.

Policyholders each challenged Insurer's failure to include GCOP in its ACV payment, but Insurer took the position that, under the policies, it was entitled to withhold GCOP until such time as Policyholders actually made the repairs to the property. Both Policyholders ultimately accepted the ACV settlement amount tendered by Insurer, but reserved their right to pursue available legal remedies. Ultimately, neither Policyholder carried out any repairs.

Both Policyholders filed individual suits against Insurer in the Court of Common Pleas of Philadelphia County alleging, *inter alia*, breach of contract for Insurer's failure to include GCOP as part of its ACV payment, which Policyholders contended was required under the terms of the policies.[5] The trial court, by the Honorable Ramy I. Djerassi, consolidated both actions. Thereafter, the parties filed cross-motions for summary judgment requesting that the trial court determine whether Insurer was permitted under

---

[5] Policyholders also alleged that Insurers' failure to include GCOP as part of their ACV payments constituted a violation of Pennsylvania's "bad faith" statute governing resolution of insurance claims, 42 Pa.C.S. § 8371. Appellant Kurach's suit also sought certification as a class action on behalf of all property owners who were issued policies by Insurer providing replacement cost coverage, and who had property damage claims for which Insurer refused to include GCOP in their ACV settlements. These claims and request for certification are not before us.

the terms of the policies to withhold GCOP from ACV payments, even where, as here, it was indisputable that the services of a general contractor would be reasonably necessary.

Before the trial court, Insurer argued that, under Section 5(e) of the policies, it was permitted to withhold payment of GCOP from ACV payments until the time repairs were actually made and Policyholders incurred the costs of retaining a general contractor. For their part, Policyholders contended that the language of the policies was ambiguous in this regard, given that "its unclear use of the term 'replacement cost' as a component of 'actual cash value' is contrary to Pennsylvania law and unenforceable." Trial Court Opinion, 4/20/17, at 9.

In resolving this question, the trial court noted that Insurer's policies defined ACV as a "function of 'replacement cost'." *Id.* at 8. Hence, the court considered cases from the Superior Court which had determined whether GCOP must be included in ACV "step-one" payments under other replacement cost insurance policies. *See id.* at 9-11 (discussing *Gilderman v. State Farm*, 649 A.2d 941, 945 (Pa. Super. 1994) (holding that, when insurer agreed to pay ACV of damaged property under policy until actual repairs and replacement were completed, but did not define the term, ACV must be construed to mean, as it had been traditionally interpreted, as reasonable replacement costs, less depreciation; thus, insurer was not authorized by the policy to automatically withhold 20 percent of the ACV payment for GCOP when the use of a general contractor was "reasonably likely" for the repairs), and *Mee v. Safeco*, 908 A.2d 344, 345 (Pa. Super. 2006) (where policy defined ACV as "the cost of repairing the damage, less reasonable deduction for wear and tear, deterioration and obsolescence," insurer was not permitted to withhold GCOP from an ACV payment, given that repair was of such a nature that the

use of a general contractor was reasonably likely, and whether or not one was actually hired was immaterial)).

The trial court observed that the policies in question utilized the same definition of ACV as the policies in *Gilderman* and *Mee*, in that they define this term as replacement cost less depreciation. The court reasoned that a determination of ACV necessarily then first requires a determination of the term replacement cost, which, as noted above, is not defined in the policies. However, the court concluded that the Superior Court's decisions in *Gilderman* and *Mee* "include GCOP as necessary components of 'replacement cost'." Trial Court Opinion, 4/20/17, at 11. The court interpreted those decisions as requiring insurers to include GCOP in ACV settlements, in accordance with what it perceived as the "majority rule" based on its review of cases from other jurisdictions, because, in its view, "higher premiums for [r]eplacement [c]ost policies justify consumer expectations that actual cash value really means replacement value minus depreciation." *Id.*

The court rejected Insurer's claim that the specific language it included in Section 5(e) required a different result. The court found that the language requiring Insurer to pay GCOP as part of an ACV settlement only if "the law of your state requires" was ambiguous and unenforceable, given that a lay purchaser of such insurance cannot reasonably be expected to understand whether or not such payment is required under Pennsylvania law. *Id.* at 12 (quoting Policy at 35). The trial court found the notion that a person buying homeowner's insurance would need legal assistance to understand this provision "troublesome." *Id.*

Moreover, in the trial court's view, the policies apply their definition of ACV — reasonable replacement cost minus depreciation — inconsistently by functionally

requiring withholding of GCOP *in addition to* depreciation when computing ACV, which it deemed contrary to the expectations of the policyholder. The trial court found that this policy language operated to "confuse [Insurer's policyholders], purposely or not, on what [Insurer] really means by its terms 'actual cash value' and 'replacement cost.'" *Id.* at 15.

The court also concluded that the portion of Section 5(e) which obligates Insurer to pay GCOP as part of ACV if the law of the policyholder's state requires was "contingent and ambiguous on its face." *Id.* It thus held that "Pennsylvania law requires estimated [GCOP] to be included in 'actual cash value' payments when the use of a general contractor is reasonably likely to be necessary to repair damage to a home." *Id.* at 16. Consequently, the trial court granted Policyholders' motion for summary judgment as to this issue.[6]

Insurer took a consolidated appeal to the Superior Court, which reversed in a unanimous unpublished memorandum opinion authored by Judge Jack Panella.[7] *Kurach v. Truck Exchange*, 1726 and 1730 EDA 2017 (Pa. Super. filed Aug. 24, 2018). That tribunal distinguished *Gilderman* on the basis that the policy at issue in that case did not define ACV, and, thus, the *Gilderman* court defined the term in accordance with the intent of the parties. The court observed that, by contrast, the policies in the case at bar do contain a definition of ACV, and it viewed this definition as consistent with *Gilderman* in that it defines ACV as replacement value less depreciation, the definition adopted in that case.

---

[6] The court deferred ruling on Policyholders' bad faith claims and request for class certification.

[7] Judge Judith Olson and P.J.E. Correale Stevens joined the opinion.

The court noted that the definition in the instant policies adds additional restrictive terms, however, limiting payment of GCOP unless and until the policyholder retains a general contractor and commences repairs.  The court observed that, in *Kane v. State Farm Fire & Casualty Co.*, 841 A.2d 1038 (Pa. Super. 2003), it held that explicit policy language can supersede definitions established by case law; thus, the panel found that the more specific definition of ACV in the policies at issue controlled over the general definition of ACV established by *Gilderman*.  Although acknowledging that the policies require GCOP to be paid as part of an ACV settlement if the law of Pennsylvania so required, the panel found that Policyholders "have not identified any case that sets forth a public policy that actual cash settlement value must include GCOP."  *Kurach*, 1726 and 1730 EDA 2017, at 9.  Hence, the Superior Court reversed the trial court's entry of summary judgment, and remanded the matter to the trial court for further proceedings.

Policyholders filed a consolidated petition for allowance of appeal with our Court, and we granted review to consider the following issue:

> Did the Superior Court err as a matter of law in finding that the limitation of payment of General Contractors Overhead and Profit from actual cash value in a replacement cost policy, although violative of binding precedent, was nonetheless valid and enforceable?

*Kurach v. Truck Insurance Exchange*, 211 A.3d 1252 (Pa. 2019) (order).

## II. Arguments of the Parties

Before our Court, Policyholders argue that it is accepted industry practice, and mandated by Pennsylvania caselaw – specifically, *Gilderman and Mee* – that GCOP must be included as part of ACV under policies such as theirs, whenever it is determined that the services of a general contractor are likely to be necessary in order to effectuate the

repair of a damaged property. However, in Policyholders' view, by refusing to pay GCOP until repairs are commenced, Insurer has created an incentive for homeowners not to make repairs, as they must advance the cost of GCOP necessary to retain the services of a general contractor in order to get the repair process started. Policyholders contend this will unjustly increase the profitability of Insurer since it does not have to pay the full value of the claim contracted for when the policyholder elects not to proceed to conduct repairs. Moreover, Policyholders aver that, if insureds are made to advance the cost of GCOP prior to commencing repairs, more policyholders will elect not to have the repairs done. They contend that this, in turn, will relieve Insurer of the obligation to pay depreciation costs and result in additional profits for the Insurer at the expense of the premium-paying customer.

Policyholders contend that there is a well established procedure for handling property loss claims under replacement value policies. First, ACV of the damaged property is determined by estimating the replacement cost — *i.e.*, the cost of replacing or repairing the property in order to return it to its pre-damaged condition. Second, the cost of depreciation is withheld in acknowledgment of the reality that the condition of the premises changed over time. However, paying GCOP is intended to facilitate the homeowner's ability to repair the property. Policyholders argue that, consistent with an insurer's duty of good faith and fair dealing, the insurer is obligated to pay the property owner a sufficient amount so as not to deter them from making the repairs.

According to Policyholders, under a two-step policy, once repairs are completed, the depreciation amount is repaid to the homeowner to make them whole since the property, as fully repaired, must now be viewed as having a present-day "brand new"

value as of the time of repair and, thus, as depreciation free.  Policyholders maintain that what Insurer has done by withholding payment of GCOP from ACV is contrary to industry practice as it does not fully compensate the homeowner for the damage to their property and, therefore, does not accurately reflect the homeowner's full cost to replace the damaged property which he has contracted to receive.

Policyholders assert that *Gilderman* established that GCOP is to be included as part of computing ACV by recognizing it as an integral part of the "replacement costs" in all instances where, as here, the services of a general contractor are reasonably likely to be necessary.  Policyholders aver that this principle remains good law as recognized by the Superior Court's subsequent decision in *Mee*.

Policyholders additionally highlight that when the legislature enacted the Pennsylvania Insurance Code, and included 40 P.S. § 636[8] governing what standard provisions must be included in a contract for fire insurance, it used the term "actual cash value" in describing the minimum requirements of such policies without elaboration; hence, Policyholders reason that, because the legislature was aware of *Gilderman* when it enacted this statute, it effectively approved of that decision's definition of ACV because it did not provide an alternate definition in the statute.

Policyholders further note that the Pennsylvania Insurance Department has prepared a guide to assist consumers in understanding homeowner's insurance coverage, and this guide defines "Replacement Cost" as "the amount to replace or rebuild your home or repair damages with materials of a similar kind and quality without deducting

---

[8] This statute mandates provisions which all insurance policies protecting "against loss by fire, lightning or removal" must contain.  40 P.S. § 636.

for depreciation," and defines "actual cash value" as "the replacement cost minus any depreciation." Policyholders Brief at 32. Policyholders propound that these definitions are consistent with *Gilderman* and recognize GCOP as a necessary component of the amount a homeowner will need to be reimbursed for a loss in the event the services of a general contractor are needed, precluding the withholding of GCOP.

At the very least, Policyholders argue that the policies are ambiguous because they are structured in a misleading and unclear fashion so as to bury Insurer's true intent. Policyholders point out that, while one section of the policy unconditionally promises to pay ACV, another provision makes the homeowner's receipt of this benefit conditional on the homeowner undertaking repairs and, in effect, eliminates the benefit, or, at a minimum, discourages reliance on it. Policyholders contend that these two clauses – one promising full reimbursement of replacement costs, and the other conditioning full reimbursement on the performance of repairs – are irreconcilable. Any such inconsistency or conflict in policy provisions, they contend, must be resolved against Insurer. Policyholders proffer that promising a benefit and then illegally withholding it in this fashion is the very essence of insurer bad faith.

Policyholders also contend that insurance contracts such as these violate the public policy of this Commonwealth, which favors payments to policyholders so that damaged properties can be repaired, and that Insurer's approach discourages repairs by withholding funds necessary to commence the repair process.[9]

---

[9] *Amicus* briefs on behalf of Policyholders have been filed by the Pennsylvania Association of Justice ("PAJ") and United Policy Holders ("UPH"), a not-for-profit consumer advocacy organization focused on insurance matters.

PAJ's brief closely tracks the arguments of Policyholders; however, it additionally highlights that the claims adjustment process in Pennsylvania is standardized and computer programs calculate replacement cost. These programs assign a value for labor, materials, depreciation, and GCOP. The point of this calculation is to ascertain what the homeowner needs to begin repairs by enlisting the services of a contractor. PAJ acknowledges that depreciation is routinely withheld from replacement costs to determine ACV, but contends this is because depreciation becomes a factor only if the structure is ultimately repaired or rebuilt, as the property must then be regarded as new and undepreciated. The value of the property at the time of the loss is, by contrast, depreciated, so its true value must account for the depreciation. However, from PAJ's perspective, before the repair or replacement begins, the homeowner is still entitled to reasonable replacement cost less depreciation, as that amount accurately reflects the cost of rebuilding or repairing, which is what the homeowner contracted for. Further, PAJ asserts this amount must include GCOP, which never depreciates and is an omnipresent expense.

In its brief, UPH contends that Insurer was obligated to pay replacement costs, which included GCOP under these policies, because the policy specifically states that Insurer must pay such fees if the law of the state requires it. In its view, after *Gilderman* and *Mee*, when ACV is used in an insurance policy in Pennsylvania, that term is understood to include GCOP. UPH avers that this position finds support from courts in the federal Sixth and Eleventh Circuits, as well as state court decisions from New York, Texas, Indiana, and Florida. Further, UPH points to interpretive guidelines issued by insurance departments in Colorado, Florida, and Texas which indicate that GCOP must always be included in a calculation of ACV under these types of policies.

UPH also highlights what it considers to be the fundamental unfairness of a contrary interpretation, citing as an example a situation where a newly-built home covered by a replacement cost policy is destroyed by fire, and the owner elects not to rebuild. In such a circumstance, there is no depreciation to withhold from ACV as the home is brand new; however, if the insurer is permitted to withhold GCOP from the ACV settlement it tenders to the policyholder, which becomes the final insurance payout since the owner elected not to rebuild, then the homeowner will not receive the full benefit of what he or she has contracted and paid for, which is replacement costs that include payment of GCOP.

In addition, UPH also avers that the practice of including GCOP in a calculation of reasonable replacement costs is well established in the insurance industry, and cites in support textbooks and trade publications endorsing this proposition.

It also argues that public policy favors this interpretation, noting that it promotes stability and continuity in society by allowing individuals to recover from staggering, life-altering losses and move forward with their lives. Thus, in its view, public policy strongly

Insurer responds by first denying the existence of any uniform system in Pennsylvania regarding the administration of homeowner's insurance claims, and proffers that the only system is that which was established by the terms of the policies. Insurer claims that many policyholders over the years have unsuccessfully challenged the right of insurers to withhold certain costs and expenses from ACV payments. Insurer notes that, in *Farber v. Perkiomen*, 85 A.2d 779 (Pa. 1952), our Court construed a single-step insurance policy – which promised ACV in the event of a loss – as not entitling the insurer to withhold from that amount the cost of depreciation. However, Insurer notes that our Court also left open the prospect that insurers could write policy terms which *did allow* for withholding depreciation from ACV. Insurer contends this is precisely what insurers subsequently did, with the adoption of two-step policies that withhold depreciation from "step one" payments for ACV, until repair or replacement of the damaged property is made. According to Insurer, such policies have been held to be enforceable in cases such as *Kane*. Thus, Insurer contends that its policy provision withholding GCOP is equally enforceable.

Insurer decries the lack of record evidence to support Policyholders' claim that the withholding of GCOP would be a deterrent for an insured to begin repairs. Insurer notes that, in Appellant Kurach's case, the amount of GCOP it withheld was $2,685.08, about

---

supports interpretations of insurance policies in accord with the settled expectations of policyholders relying on them. UPH proffers that a contrary interpretation would permit insurers to pay less than the benefit promised by withholding GCOP, and that this would, in effect, result in policyholders purchasing illusory coverage — something the law should not countenance.

17% of the total replacement costs. Insurer adds that, in other decisions, courts have upheld the withholding of depreciation payments in far larger amounts.

Further, Insurer rejects Policyholders' reliance on *Gilderman* and *Mee*. It highlights that the policies in question in those cases, unlike the policies at issue in the instant appeal, were silent as to a policyholder's entitlement to payment of GCOP as part of ACV.

Likewise, Insurer disputes Policyholders' reliance on 40 P.S. § 636. It observes that Section 636 addresses fire insurance policies, not the so-called "all-risk" policies issued to Policyholders. Also, Insurer points out that Section 636 was adopted in 1962, not in response to *Gilderman* or *Mee*, and it concerns a one-step policy, not the two-step policies which it contends are prevalent today.

Insurer also rejects Policyholders' argument that the Insurance Department's consumer guide has any bearing on this case, as it is a general guide explaining terms commonly appearing in many policies, but it also cautions that the user should read his or her own specific policy to understand its terms.

In addition, Insurer claims that these policies do not contravene any public policy of the Commonwealth given that, in its view, *Gilderman* and *Mee* do not control the disposition of this question, and because there is no clearly recognized legal requirement, in caselaw or statute, that GCOP must be paid as part of an ACV settlement.

Regarding Policyholders' contention that the policy language is ambiguous, Insurer claims that that issue is not fairly subsumed within our Court's allocatur grant, which dealt only with the question of whether this policy language is valid and enforceable in light of *Gilderman* and *Mee*. To the extent that our Court does consider it fairly subsumed, Insurer denies that its policy is ambiguous or confusing; instead, it claims that

that the Superior Court properly found that this language "'clearly and obviously' explains that payment of GCOP is conditioned on the insured incurring that expense in the course of making covered repairs." Insurer Brief at 54 (quoting *Kurach*, 1726 and 1730 EDA 2017, at 9). Consequently, Insurer maintains that the policy should be enforced as written.[10]

## III. Analysis

In interpreting the relevant provisions of the insurance policies at issue in this appeal, we are guided by the polestar principle that insurance policies are contracts between an insurer and a policyholder. *Gallagher v. Geico Indemnity Company*, 201 A.3d. 131, 137 (Pa. 2013). Thus, we apply traditional principles of contract interpretation in ascertaining the meaning of the terms used therein. *Id.* This requires our Court to effectuate the intent of the contracting parties as reflected by the written language of the insurance policies. *American and Foreign Insurance Company v. Jerry's Sport Center*, 2 A.3d 526, 540 (Pa. 2010). In this regard, the language of the policy must be considered

---

[10] A joint *amicus* brief in support of Insurer was filed by the Insurance Federation of Pennsylvania, the American Property Casualty Insurance Association, and National Association of Mutual Insurance Companies. *Amici* largely align with the arguments of Insurer, contending that the Superior Court decision should be upheld because the policy language is clear: a policyholder is not entitled to the receipt of GCOP until he or she actually starts rebuilding or repairing, when these fees are actually incurred.

These *amici* also reject the contention that a contrary interpretation of the policies at issue is against public policy, stressing that it is up to the legislature to make public policy, not courts. Thus, decisions like *Gilderman* and *Mee*, decisions from other jurisdictions, and guidance bulletins from other state insurance departments do not establish a dominant public policy that can override the clear language of the policies in question, as those decisions and guidance only apply to policies which are silent about GCOP, and these policies are not.

in its entirety. *Pennsylvania National Mutual Casualty Insurance v. St. John,* 106 A.3d 1, 14 (Pa. 2014).

If policy terms are clear and unambiguous, then we will give those terms their plain and ordinary meaning, unless they violate a clearly established public policy. *AAA Mid-Atlantic Insurance Company v. Ryan*, 84 A.3d 626, 633-34 (Pa. 2014). Conversely, when a provision of a policy is ambiguous, the policy provision is to be construed in favor of the policyholder and against the insurer, as the insurer drafted the policy and selected the language which was used therein. *Prudential Property & Casualty Insurance Company v. Sartno*, 903 A.2d 1170, 1177 (Pa. 2006). Policy terms are ambiguous "if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Construction Company v. Harleysville Mutual Insurance Company*, 735 A.2d 100, 106 (Pa. 1999).[11]

In the case *sub judice*, as recounted above, the relevant provisions of the policies are the definition of ACV, and Section 5(e), the latter of which establishes the timing of payment of depreciation costs and GCOP. Both of these provisions must be read

---

[11] Inasmuch as these cases establish that the interpretation of insurance policy terms necessarily depends on an assessment of whether those terms are plain or ambiguous, we reject Insurer's contention that the question of whether the provisions of the policies at issue in this case are ambiguous is somehow beyond the scope of our grant of allocatur. Additionally, the question of whether a particular contract provision is ambiguous is a matter of law, *Kripp v. Kripp*, 849 A.2d 1159, 1164 n.5 (Pa. 2004); therefore, as with all such questions of law, we are not bound by the lower courts' determinations. *United National Insurance Company v. J.H. Refractories*, 688 A.2d 120, 124 n.4 (Pa. 1995). In this regard, we cannot agree with the suggestion of the dissent that, in performing our ambiguity analysis, we are required to defer to the conclusions of the lower courts, or the claims of the parties. *See* Concurring and Dissenting Opinion (Wecht, J.) at 8 ("The reasonable disagreement among the lower courts and the parties that brought us here is evidence that Policyholders could not have known what" the law of Pennsylvania required.); *id.* at 7 ("[T]he fact that the Court has been called upon to decide this issue in this case means that the Policy was ambiguous for Policyholders.").

together and each given effect. *Pennsylvania National Mutual Casualty Insurance*, *supra*. The policies first define the "step one" ACV payment as the "reasonable replacement cost at time of loss less deduction for depreciation and both economic and functional obsolescence." Policy at 6. Section 5(e) then imposes additional restrictions on whether and when GCOP will be paid to the policyholder — namely, it obligates Insurer to make such payment to the policyholder only when he "actually incur[s] and pay[s] such fees and charges, unless the law of your state requires that such fees and charges be paid with the actual cash value settlement." *Id.* at 35.

Thus, the policies, by their plain terms, guarantee that the policyholder will be paid the ACV of the damaged property at the time of the loss; however, it also specifies that payment of GCOP is conditional in that such payment will not be made unless and until the policyholder actually incurs such costs by commencing the repair process, "unless the law of [Pennsylvania] requires" GCOP to be included in the payment of ACV. Critically, our review of Pennsylvania law does not support Policyholders' contention that it mandates that GCOP be included in ACV for every claim made under a replacement cost policy, as we discern no such requirement in statute, regulation, or caselaw.[12]

---

[12] We reject Policyholders' contention that 40 P.S. § 636 imposes such a requirement, as that statutory provision mandates the coverage which must be included in *fire insurance* policies. As Insurer contends, this section is inapplicable to all-risk policies of the type at issue in this case. *See* 40 P.S. § 636(3) (holding that the mandatory provisions of policies of fire insurance "shall not apply to . . . policies of an all-risk type.").

Likewise, the homeowners insurance guide issued by the Pennsylvania Department of Insurance, which explains to consumers the general nature of insurance policies offering replacement cost coverage, is merely a general explanation of the relevant insurance principles a consumer may encounter when purchasing such a policy. *See Your Guide to Homeowners Insurance,* Pennsylvania Department of Insurance (Exhibit Q to Wintersteen Motion for Summary Judgment) (R.R. 1232a-1247a). As such,

Although, as detailed above, Policyholders contend that the Superior Court's decisions in *Gilderman* and *Mee* require GCOP to be automatically included as a component of ACV, our reading of those decisions belies that assertion. In those cases, the replacement cost policies under consideration allowed only the depreciated value of the damaged property to be withheld from ACV. *See Gilderman*, 649 A.2d at 942; *Mee*, 908 A.2d at 345. The policies were otherwise silent as to whether GCOP could be withheld from ACV. Thus, in ruling on whether the insurers therein could withhold GCOP from the challenged ACV settlements, the Superior Court addressed whether, in the absence of contrary policy language, such costs were customarily included in ACV, whenever the policyholder could reasonably be expected to incur such costs in repairing or replacing the damaged property – and it concluded that they were. *See Gilderman*, 649 A.2d at 944-45; *Mee*, 908 A.2d at 350. However, in each case, the Superior Court was merely interpreting the language of the specific policies before it, and did not purport to hold that GCOP must *always* be included in ACV payments.

Consequently, those decisions must be read in light of the unique policy language at issue. They cannot be construed as establishing a general mandate that ACV includes GCOP. *See generally City of Pittsburgh v. W.C.A.B.*, 67 A.3d 1194, 1206 (Pa. 2013*)* (emphasizing the general axiom that the holding of a particular case "must be read against its facts and the issues actually joined").In particular, *Gilderman* and *Mee* do not control where there is specific policy language which conditions the timing of GCOP payments on the policyholder undertaking actual repairs of the damaged property.

---

it does not have the binding legal force of a duly promulgated regulation by the Department.

Critically, the policies in the case at bar, unlike those at issue in *Gilderman* and *Mee*, explicitly condition payment of GCOP on the policyholder actually incurring such costs upon the commencement of repairs.[13] Given that the law of Pennsylvania does not otherwise require payment of GCOP before repairs begin, we hold that, because Policyholders did not undertake such repairs, under the terms of their policies, Insurer was permitted to withhold GCOP from its ACV – "step one" – payments. We therefore affirm the order of the Superior Court.

Order affirmed.

Chief Justice Saylor and Justices Baer and Donohue join the opinion.

Justice Wecht files a concurring and dissenting opinion.

Justice Mundy files a concurring and dissenting opinion in which Justice Dougherty joins.

---

[13] Public policy challenges were not raised in *Gilderman* or *Mee*; rather, the analysis in those decisions rested wholly on principles of contractual interpretation. Hence, contrary to Policyholders' assertions, those cases do not establish a public policy precluding the GCOP provisions as found in Policyholders' policies. Moreover, as our Court has recently reminded, "a challenger who asserts that clear and unambiguous contract provisions . . . are void as against public policy carries a heavy burden of proof. This is because public policy 'is more than a vague goal which may be used to circumvent the plain meaning of the contract.'" *Sayles v. Allstate Ins. Co.*, 219 A.3d 1110, 1122-23 (Pa. 2019). Our Court has delineated specific guiding principles under which a particular provision of an insurance policy will contravene public policy. *See Safe Auto Insurance Company v. Guillermo*, 214 A.3d 1257, 1262 (Pa. 2019) (reiterating that invalidation of an insurance contract on public policy grounds is justified where the contract violates a "dominant public policy" as evidenced by "long governmental practice or statutory enactments, or . . . obvious ethical or moral standards"). Policyholders have not carried this burden in that they have not established that the insurance contract provisions at issue conflict with a long governmental practice, a statutory enactment, or obvious ethical or moral standards.